# EXHIBIT G

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHISN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| JAVIER SANTIAGO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | No.    10 C 4691 |
| SERGEANT RONAN, Star No. 2040, | ) | |
| P.O. MICHAEL TEWS, Star No. 10733, | ) | |
| P.O. G. MOUSSA, Star No. 5509, | ) | JUDGE LEINENWEBER |
| KEN SAHNAS, Star No. 331, P.O. NOEL | ) | |
| LIBOY, Star No. 13447, P.O. MK DROZD, | ) | |
| Star No. 19034, P.O. A.A. COLINDRES, | ) | |
| Star No. 19763, P.O. T. A. SURMA, Star No. 7993, | ) | |
| D. M. SAHNAS, Star No. 789, and the | ) | |
| CITY OF CHICAGO, | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANT LT. KEN SAHNAS'S RESPONSE
## TO PLAINTIFF'S FIRST SET OF INTERROGATORIES

Defendant Lt. Ken Sahnas, (hereinafter "Lt. Sahnas"), by and through one of his attorneys Christopher A. Wallace, Assistant Corporation Counsel of the City of Chicago, responds to Plaintiff's First Set of Interrogatories, as follows:

1.      State the name and address of the individual answering these interrogatories.

**ANSWER**:      Lt. Sahnas objects to this interrogatory as seeking information not reasonably calculated to lead to the discovery of admissible evidence and as seeking personal information of a police officer, such as his home address, as such information has no bearing on this case and disclosure of which presents a privacy and safety concern to him and his family.  Subject to and without waiving these objections, Lt. Sahnas states that his name is Ken Sahnas.

2.      Identify each person who participated in furnishing any information with respect to the answers to these interrogatories, and state the number of each interrogatory for which each

person furnished information.

**ANSWER**: Lt. Sahnas objects to this interrogatory as vague. Subject to and without waiving this objection, Lt. Sahnas states that no one furnished any substantive information other than himself and that he responded to these interrogatories with the assistance of his counsel.

3. Identify all persons with any knowledge or information concerning any of the claims or defenses in this case, including but not limited to, claims concerning the initial stop and/or detention of Plaintiff by Chicago police officers on or about July 27, 2008, the arrest of Plaintiff on or about July 27, 2008, the charging of Plaintiff, the continued detention of Plaintiff on or about July 27, 2008 until his release from police custody, and the prosecution of Plaintiff. Briefly summarize the knowledge or information that each such person has or is believed to have.

**ANSWER**: Lt. Sahnas objects to this interrogatory as overbroad in scope, to the extent it seeks information beyond his personal knowledge and as seeking information equally or more available to Plaintiff. Subject to and without waiving these objections, Lt. Sahnas states that he was the watch commander in the 013th district police station on July 27, 2008, and as part of his administrative responsibilities he executed the initial approval of probable cause portion of Plaintiff's arrest report. Responding further, Lt. Sahnas states that the initial approval of probable cause is a ministerial duty performed by a supervisor upon review of an arrest report. Lt. Sahnas did not participate in the arrest of the Plaintiff and did not witness him being arrested.

4. Identify any conversations, communications, statements, reports or admissions of or between any persons or parties, relating to this litigation, the facts of this litigation, or any of the allegations or defenses contained in the pleadings filed in this litigation, and set forth:

    a. The name and address of each party or person who made or gave the statement;

    b. The exact substance of the statement;

    c. The date and time when such statements were made;

    d. Identify the persons who took such statements and the persons who have or had a copy of such statements;

2008;

b.    Why Plaintiff was arrested by Chicago police officers on or about July 27, 2008;

c.    Why Plaintiff was detained by Chicago police officers on or about July 27, 2008 following Plaintiffs arrest through the time of his release from police custody;

d.    Why Plaintiff was charged with a crime on or about July 27, 2008;

e.    Why Plaintiff was prosecuted for possession of a firearm.

**ANSWER:**    Lt. Sahnas objects to this interrogatory as overbroad in scope and unduly burdensome, as seeking information equally available to Plaintiff, and to the extent it seeks information beyond his personal knowledge. Subject to and without waiving these objections, Lt. Sahnas states that he did not participate in the arrest of the Plaintiff, did not witness him being arrested, and did not interact with Plaintiff at any point. Lt. Sahnas states that upon information and belief the police reports generated in relation to the arrest and the arresting officers will likely have information responsive to this interrogatory. Responding further, Lt. Sahnas refers Plaintiff to his response to interrogatory no. 9.

7.    Did you engage in any physical contact with the Plaintiff during the course of your interaction with him? If so, please describe the nature and extent of the physical contact, identify who witnessed the contact, and identify any and all justification you had for such contact.

**ANSWER:**    Lt. Sahnas did not interact with Plaintiff at any point. Therefore, he responds: No.

8.    Did you witness any police officer, regardless of rank, engage in any physical contact with the Plaintiff during the course of his arrest and/or detention by Chicago police officers? If so, please describe the nature and extent of the physical contact, identify the persons who made physical contact, and identify any other witnesses to the contact.

**ANSWER:**    No.

9.    What is your understanding of your role as it relates to the arrest, detention, and charging of Plaintiff on and after July 27, 2008?

**ANSWER:**    Lt. Sahnas states that he was the watch commander in the 013th district police station on July 27, 2008, and as part of his administrative responsibilities he executed the

initial approval of probable cause portion of Plaintiff's arrest report. Responding further, Lt. Sahnas states that the initial approval of probable cause is a ministerial duty performed by a supervisor upon review of an arrest report and that the approval signifies that the report sets forth sufficient information to satisfy probable cause. Responding further, Lt. Sahnas states that he populated comments in the watch commander comment section of the arrest report to document that a parole violation warrant was issued against Plaintiff, and, upon information and belief, populated the felony review portion of the arrest report. Lt. Sahnas did not participate in the arrest of the Plaintiff, did not witness him being arrested, and did not interact with Plaintiff at any point.

      10.    Please describe the following:

      a.    Your assignment during all relevant time periods on July 27, 2008, indicating the scope of said assignment and who was responsible for such assignment;

      b.    What you said, or what you heard anyone else say, to Plaintiff during Chicago police interaction with him on or about July 27, 2008, including what you or anyone else said to Plaintiff when you first approached him and at any time thereafter; and

      c.    What Plaintiff said to you or what you heard Plaintiff say to anyone else, during Chicago police interaction with him on or about July 27, 2008, including what Plaintiff said to you or anyone else when you first approached him and at any time thereafter.

**ANSWER:**    Lt. Sahnas objects to this interrogatory as overbroad. Subject to and without waiving this objection, Lt. Sahnas states that he was assigned as the watch commander in the 013th district. His responsibilities were administrative. Responding further, Lt. Sahnas states that he did not participate in the arrest of the Plaintiff, did not witness him being arrested, and did not interact with Plaintiff at any point.

      12.    Please identify any recording device, audio or visual, in the vicinity of the initial stop, detention, and/or arrest of Plaintiff on or about July 27, 2008, including any street light camera, recording device maintained by you or any member of the Chicago police department or the City of Chicago, or any recording device maintained by any private property owner at or near the situs of the stop, detention, and arrest of Plaintiff.

## <u>VERIFICATION</u>

I, Ken Sahnas, a Defendant in the above-captioned matter, declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and belief.

Ken Sahnas

# EXHIBIT H

**A504BF9**
**LIEUTENANT KEN SAHNAS      May 17, 2011**

```
 1    STATE OF ILLINOIS    )
                           )    SS:
 2    COUNTY OF COOK       )

 3       IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
            COUNTY DEPARTMENT - MUNICIPAL DIVISION
 4

 5    JAVIER SANTIAGO,              )
                                    )
 6                     Plaintiff,   )
                                    )
 7        vs.                       )  No. 10 C 4691
                                    )
 8    CITY OF CHICAGO, a municipal  )
      corporation, et al.,          )
 9                                  )
                       Defendants.
10

11            The discovery deposition of LIEUTENANT KEN

12    SAHNAS, taken under oath on the 17th day of May 2011,

13    at Suite 500, 20 South Clark Street, Chicago,

14    Illinois, pursuant to the Rules of the Supreme Court

15    of Illinois and the Code of Civil Procedure, before

16    Devan J. Moore, a certified shorthand reporter, in

17    and for the County of Cook and State of Illinois,

18    pursuant to notice.

19

20

21

22    ATKINSON-BAKER, INC.
      COURT REPORTERS
23    (800)288-3376
      www.depo.com
24    FILE NO.: A504BF9
```

Page 1

**Atkinson-Baker, Inc.**                    **1 (800) 288-3376**

A504BF9
**LIEUTENANT KEN SAHNAS**    May 17, 2011

Page 2

```
 1   APPEARANCES:
 2     BAUMANN & SHULDINER, by
       MS. DEIDRE BAUMANN
 3     20 South Clark Street
       Suite 500
 4     Chicago, IL 60603
       (312)372-8242
 5       for the plaintiff;
 6     CITY OF CHICAGO DEPARTMENT OF LAW, by
       MS. AMY PRESTON
 7     30 North LaSalle Street
       Room 1400
 8     Chicago, IL 60602
       (312)742-4045
 9       for the defendants.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 3

```
 1           I N D E X
     Witness:                 Page
 2   LIEUTENANT KEN SAHNAS
        Examination by:
 3      Ms. Baumann        4
 4
 5
           E X H I B I T S
 6   Number                  Page
     Sahnas Deposition Exhibit No. 1    9
 7
     (Exhibit not submitted for attachment.)
 8
 9
       C E R T I F I E D   Q U E S T I O N S
10   Page                    Line
     None.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 4

```
 1              (Witness sworn.)
 2          LIEUTENANT KEN SAHNAS,
 3   called as a witness herein, having been first duly
 4   sworn, was examined and testified as follows:
 5              EXAMINATION
 6              BY
 7              MS. BAUMANN:
 8      Q   Lieutenant, please state your name.
 9      A   Ken Sahnas.
10      Q   And where do you live, generally?
11      MS. PRESTON:  I'm going to object to him
12   providing his address on the record because I think
13   that's a safety concern to the officer.  And I
14   instruct him not to provide his address.
15   BY MS. BAUMANN:
16      Q   Are you married?
17      A   Yes.
18      Q   And how long have you been married?
19      A   25 years.
20      Q   Do you have children?
21      A   Yes.
22      Q   How many?
23      A   2.
24      Q   And their ages, please?
```

Page 5

```
 1      A   21 and 23.
 2      Q   Boys...?  Girls...?
 3      A   One each.
 4      Q   And how long have you been working for
 5   Chicago Police?
 6      A   25 years plus.
 7      Q   And what's your current position?
 8      A   Lieutenant.
 9      Q   And what are the scope of your duties as
10   lieutenant?
11      A   Generally I'm either acting a watch
12   commander in the absence of a higher rank captain; or
13   I am a field lieutenant, supervising field activities
14   when there is a captain.
15      Q   What does a field lieutenant supervisor do?
16      A   He oversees operations in the field; looks
17   in on the sergeants and looks in on the officers; and
18   responds to assignments, crime conditions out there
19   in the field.
20      Q   And the watch commander, what do those
21   roles include?
22      A   A watch commander is generally an inside
23   position in the station.  And one of the primary
24   duties is prisoners, probable cause, station
```

2 (Pages 2 to 5)

**Atkinson-Baker, Inc.**                    **1 (800) 288-3376**

A504BF9
**LIEUTENANT KEN SAHNAS**     May 17, 2011

**Page 6**

1  security.
2  Q   On the date in question, July 27th of
3  2008 --
4        First of all, what area are you in
5  currently?
6  A   Currently I'm in the 10th District.
7  Q   Okay.  Where is that?
8  A   3315 West Ogden.
9  Q   How long have you been there?
10  A   About 3 years.
11  Q   Okay.  On the date in question, July 27th
12  of '08, were you in 10th District?
13  A   No.
14  Q   Where were you?
15  A   I was in the 13th District.
16  Q   And where is that located?
17  A   What is it?  900 or so North Wood.  938
18  North Wood.
19  Q   Okay.  And why were you transferred -- were
20  you transferred from the 13th to the 10th?
21  A   Yes.
22  Q   And why were you transferred?
23  A   Manpower issues.
24  Q   Were your duties as lieutenant as you

**Page 7**

1  described them the same duties that you had on July
2  27th of '08?
3  A   Yes.
4  Q   Did they differ in any way?
5  A   No.
6  Q   Okay.  On that date do you know if the
7  watch -- were you serving as watch commander?
8  A   Yes, I was.
9  Q   So the captain wasn't there at that time?
10  A   Correct.
11  Q   And you were responsible for the probable
12  cause determination in this case?
13        MS. PRESTON: Objection to form.
14  BY MS. BAUMANN:
15  Q   Were you responsible for the probable cause
16  determination in this case?
17  A   I reviewed the arrest report, yes, I did.
18  Q   How do you make a probable cause
19  determination?
20        MS. PRESTON: Objection.  Misstates testimony
21  and form.
22        Go ahead.
23        MS. BAUMANN: I didn't hear you.
24        MS. PRESTON: Objection.  Misstates testimony

**Page 8**

1  and form.
2        THE WITNESS: I believe you're asking a watch
3  commander's duties when presented with the arrest
4  report?
5  BY MS. BAUMANN:
6  Q   Yes.
7  A   Okay.  I review it for correctness.  I
8  review it for the charges are correctly stated; that
9  the narrative supports the charges.  And most of the
10  other stuff is the administrative review of other
11  stuff, whether the person has children that need to
12  be taken care of, did the victim get aid, medical
13  attention, et cetera.
14  Q   On July 27th, '08 or any time thereabout
15  did you meet Javier Santiago?
16  A   No.
17  Q   Were you present at the time he was
18  detained or arrested?
19  A   Yes.
20  Q   Okay.  And where were you present for that?
21  A   I was present when the officers -- the
22  arresting officers presented me with his arrest
23  report for review.
24  Q   Who were the arresting officers?

**Page 9**

1  A   I believe it was Sergeant Ronan (phonetic).
2  And without having the arrest report in front of me,
3  it was Officer Tooze (phonetic).
4  Q   Was the arrest report a case incident
5  report, or is that something different?
6  A   It's something different.
7  Q   So other than the arrest report do you
8  review any other documents when making your probable
9  cause determination?
10  A   Generally not.
11  Q   In this case do you recall if you reviewed
12  any other documents?
13  A   I do not recall.
14  Q   And I will hand you what we'll mark as
15  Deposition No. 1.
16        (Whereupon, Sahnas Deposition
17        Exhibit No. 1 was marked for
18        identification.)
19  BY MS. BAUMANN:
20  Q   Take a look at that.
21  A   Yes, this appears to be the arrest report I
22  was presented with and which I signed.  I approved
23  probable cause on it.
24  Q   And do you not recall any --

3 (Pages 6 to 9)

A504BF9
**LIEUTENANT KEN SAHNAS**    May 17, 2011

1    A    The general workings of a uniformed patrol
2  officer.
3    Q    **What does field duties encompass?**
4    A    Kind of like the same thing.
5    Q    **You were at the training division for 2**
6  **years.  Why did you leave the training division?**
7    A    I was promoted to sergeant.
8    Q    **And where were you assigned?**
9    A    The 25th District.
10    Q    **And what do you do as sergeant?**
11    A    I supervise patrolmen.
12    Q    **Okay.  How long were you sergeant at the**
13  **25th?**
14    A    Approximately 2 years.
15    Q    **Is it common to move around like this in**
16  **Chicago Police?**
17    MS. PRESTON:  Objection.  Form.  Argumentative.
18        Go ahead.
19    THE WITNESS:  It's common.
20  BY MS. BAUMANN:
21    Q    **Where did you go next?**
22    A    I was the supervisor of driver training.
23    Q    **Where at?**
24    A    For the Department.  We had different

Page 14

1  BY MS. BAUMANN:
2    Q    **Why don't you give me some examples of the**
3  **type of...?**
4    A    Examples are we've had 3 weeks worth of
5  training in pre-service lieutenant, pre-service
6  sergeant.  A lot of it is law, probable cause,
7  police -- what's the word I'm looking for?  Police
8  operations.  A review of just about everything.
9    Q    **And do all officers take training courses**
10  **in law?**
11    MS. PRESTON:  Objection.  Foundation.
12  BY MS. BAUMANN:
13    Q    **If you know.**
14    A    All officers do get occasional training, be
15  it anywhere from 2 hours to 8 hours, I believe on a
16  regular basis.  Supervisors get more.
17    Q    **How about with probable cause?  What sort**
18  **of training, if you know, do officers generally get?**
19    A    They generally get a few hours.  Well, in
20  the training division they get extensive -- I'm not
21  sure as to the amount of hours.  Dozens more.
22        After their in-service there's usually
23  a yearly review.  Right now there's a program where
24  if it's a 3-hour update on probable cause, every

Page 16

1  locations as availability of land.  But I was
2  assigned to the training division and in charge of
3  driver training.
4    Q    **And what would you do in terms of**
5  **supervising?**
6    A    I had a group of instructors, generally
7  between 6 and 9 instructors.  And we provided
8  training to recruits and in-service officers.
9    Q    **Okay.  Could you tell me how long you did**
10  **that.**
11    A    Yes.  Almost 6 years.
12    Q    **6 years?  Does that take us to...?**
13    A    2005, I believe, where I made lieutenant.
14    Q    **Okay.  Have you worked for any other police**
15  **departments?**
16    A    No.
17    Q    **What training have you received during the**
18  **course of your employment since 1986?**
19    MS. PRESTON:  Objection to form.
20        Go ahead.
21    THE WITNESS:  That's kind of a complicated
22  question.  We had lots of training, as simple as
23  1 day to stuff that's 2 weeks.
24

Page 15

1  officer has to attend.
2    Q    **And you mentioned "police operations".**
3  **What does that include?**
4    A    Just about everything.  Anything from
5  writing reports to driving a car.
6    Q    **And I assume all officers receive**
7  **operations training?**
8    A    They have to, yes, to graduate.
9    Q    **What is your understanding of the term**
10  **"probable cause"?**
11    MS. PRESTON:  Objection.  Form.
12        Go ahead.
13    THE WITNESS:  That there is enough information
14  provided on the arrest report to substantiate a
15  charge being placed against an arrestee.
16  BY MS. BAUMANN:
17    Q    **And you're talking from the standpoint of**
18  **the watch commander or lieutenant serving in the**
19  **function of approving officer; correct?**
20    MS. PRESTON:  Objection.  Form.
21        Go ahead.
22    THE WITNESS:  Yes.  In terms of me looking at
23  an arrest report for probable cause, yes.
24

Page 17

5 (Pages 14 to 17)

A504BF9
**LIEUTENANT KEN SAHNAS**     **May 17, 2011**

1  status? **Do you know why it was upgraded?**
2      A    It's multiple reasons.  His record and his
3  felony status is one of the considerations, along
4  with the probable cause for the stop -- yeah, I think
5  it's basically on his felony status.
6          The UUW by a felon, you have to be a
7  felon.  So it's just the face are you a felon or
8  aren't you a felon, yes.
9      **Q    Did you witness any of the -- did you ever**
10 **see Javier Santiago?**
11     A    No, I never saw him.
12     **Q    Okay.  I take it you didn't see any of the**
13 **officers bringing him in or taking him out or**
14 **transporting him?**
15     A    No, I did not see any of those officers or
16 Javier Santiago.
17     **Q    And you consider the initial approval of**
18 **probably cause a ministerial duty?**
19     A    Yes.  In the definition of a "duty," yes.
20     MS. BAUMANN:  I have nothing further.
21     MS. PRESTON:  Okay.  We'll reserve signature.
22     FURTHER DEPONENT SAITH NAUGHT . . .
23
24
                                          Page 54

1  STATE OF ILLINOIS   )
                       ) SS:
2  COUNTY OF COOK      )
3     IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
          COUNTY DEPARTMENT - MUNICIPAL DIVISION
4
5  JAVIER SANTIAGO,          )
                            )
6          Plaintiff,       )
                            ) No. 10 C 4691
7     vs.                    )
                            )
8  CITY OF CHICAGO, a municipal )
   corporation, et al.,       )
9                            )
           Defendants.
10
11         This is to certify that I have read the
12 transcript of my deposition taken on the 17th day of
13 May 2011 in the foregoing cause, and that the
14 foregoing transcript accurately states the questions
15 asked and the answers given by me, with the changes
16 or corrections, if any, made on the Errata Sheet(s)
17 attached hereto.
18
19
                    _____
20                  LIEUTENANT KEN SAHNAS
21                  This _____ day
                    of _____ 2011.
22
23
24
                                          Page 55

                                   15 (Pages 54 to 55)

**Atkinson-Baker, Inc.**                **1 (800) 288-3376**

# EXHIBIT I

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| JAVIER SANTIAGO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 10 C 4691 |
| | ) | |
| SERGEANT RONAN, Star No. 2040, | ) | Judge Leinenweber |
| P.O. MICHAEL TEWS, Star No. 10773, | ) | |
| P.O. G. MOUSSA, Star No. 5509, | ) | Mag. Judge Finnegan |
| KEN SAHNAS Star No. 331, P.O. NOEL | ) | |
| LIBOY, Star No. 13447, P.O. M.K. DROZD, | ) | |
| Star No. 19034, P.O. A.A. COLINDRES, | ) | |
| Star No. 19764, P.O. T.A. SURMA, | ) | |
| Star No. 7993, D.M. DOWD, Star No. 789, and | ) | |
| the CITY OF CHICAGO, | ) | |
| | ) | |
| Defendants. | ) | |

## AFFIDAVIT OF DONNA DOWD

I, Donna Dowd, having first been duly sworn under oath, state the following:

1.     My name is Donna Dowd and I am a Lieutenant with the Chicago Police Department. On July 27, 2008, I was working as the acting watch commander assigned to the Fourteenth Police District, located at 2150 N. California, Chicago, Illinois 60647.

2.     On July 27, 2008, I was on duty and working the first watch. My shift, the first watch, began at approximately 10:00 p.m. on July 27, 2008, and ended at approximately 6:00 a.m. on July 28, 2008.

3.     I did not participate in the arrest of Plaintiff Javier Santiago, did not witness him being arrested, and did not interact with Plaintiff at any point.

4.     I did not generate any reports in relation to the arrest of the Plaintiff Javier Santiago.

5.     A review of the police reports prepared in relation to Plaintiff's arrest will show my electronic signature on page five (5) of Plaintiff's arrest report (*see* Plaintiff's Arrest Report, attached

hereto as Ex. A, page 5, bates no. FCRL 14), adjacent to "Final Approval of Charges" portion of the report.

6.     My electronic signature appears on page five (5) of Plaintiff's arrest report adjacent to "Final Approval of Charges" because, as part of my administrative responsibilities as the acting watch commander on July 27-28, 2008, I would have reviewed a copy of the completed arrest report submitted to me and executed the final approval of charges portion of Plaintiff's arrest report by affixing my electronic signature. The "final approval" I executed is a ministerial duty performed by the watch commander upon review of a completed arrest report. The approval signifies that the report submitted by the arresting officers sets forth sufficient information to satisfy the elements for the offense(s) listed.

FURTHER AFFIANT SAYETH NOT.

_____
Donna Dowd

Signed and sworn before me
this 13th day of December, 2011

_____
Notary Public

"OFFICIAL SEAL"
MAUREEN MULROE
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 9/20/2014

2

**CHICAGO POLICE DEPARTMENT**
## ARREST REPORT
3510 S. Michigan Avenue, Chicago, Illinois 60653
(For use by Chicago Police Department Personnel Only)
CPD-11.420C(REV. 6/30)

**FINAL APPROVAL**

CB #: 17313997
IR #: 783530
YD #:
RD #: HP477994
EVENT #: 0820914014

### ARREST REPORTING

**OFFENDER**

Name: **SANTIAGO, Javier**
  Res: 1944 W Chicago Ave, #2ND
    Chicago, IL 60622    Beat: 1322
DOB: ████1967
AGE: 41 years
POB: Illinois
SSN: ████0922
ARMED WITH Handgun

Male
White Hispanic
5' 06"
185 lbs
Brown Eyes
Black Hair
Long Hair Style
Medium Brown
Complexion

Marks:  Tattoo Tear Drop on Right Eye
  Tattoo Devil,Rabbit,Praying Hands on Lower Left Arm
  Tattoo Cobra,Bear on Lower Left Leg
  Tattoo Mary on Back
  Tattoo Boxing Gloves on Lower Right Arm
  Tattoo Puerto Rican Flag,Rose on Upper Right Arm
  Tattoo Debbie on Neck
  Tattoo Heart,Monica,Javier on Lower Right Leg

**INCIDENT**

Arrest Date: 27 July   2008 15:46    TRR Completed? No    Total No Arrested: 1    Co-Arrests    Assoc Cases
  Location: 925 N Damen Ave    Beat: 1322    DCFS Ward ? No
    Chicago, IL 60622
    304 - Street    Dependent Children? No
Holding Facility: District 014 Lockup
Resisted Arrest?   No

**CHARGES**

|   |   |   | Victim |
|---|---|---|---|
| 1 | Offense As Cited | **720 ILCS 5.0/24-1.1-A** | State Of Illinois, P.O. Tews #10773 |
|   |   | UUW - WEAPON - FELON/PAROLE-POSSESS/USE FIREARM PRIOR. Class 2 - Type F |   |
| 2 | Offense As Cited | **720 ILCS 5.0/24-1.6-A-3-C** | State Of Illinois, P.O. Tews #10773 |
|   |   | UUW - WEAPON - NO FOID Class 4 - Type F |   |
| 3 | Offense As Cited | **415 ILCS 105.0/5** | State Of Illinois, P.O. Tews #10773 |
|   |   | LITTERING FROM MTR VEHICLE Class B - Type M |   |
| 4 | Offense As Cited | **625 ILCS 5.0/6-101** | State Of Illinois, P.O. Tews #10773 |
|   |   | DRIVING/NEVER ISSUED LICENSE Class B - Type M |   |
| 5 | Offense As Cited | **625 ILCS 5.0/3-707** | State Of Illinois, P.O. Tews #10773 |
|   |   | INSURANCE - OPERATE MTR VEHICLE WITHOUT Class U - |   |
| 6 | Offense As Cited | **720 ILCS 5.0/24-5-B** | State Of Illinois, P.O. Tews |

IR #783530
CB #17313997

Print Generated By: SIZEMORE, Gail ( PC0E710 )    Page 1 of 5    27 SEP 2010 11:37

*powered by: CLEAR Technology*



**EXHIBIT**
# A

Santiago, 10 C 4691
0010

**Chicago Police Department - ARREST Report**

CB #: 17313997

SANTIAGO, Javier

## ARREST REPORTING

| | | | |
|---|---|---|---|
| 7 | Offense As Cited | POSS FIREARM W/DEFACED SERIAL NUMBER<br>Class 3 - Type F<br>**725 ILCS 5.0/110-3**<br><br>ISSUANCE OF WARRANT | #10773<br><br>State Of Illinois, P.O. Tews<br>#10773 |

**FELONY REVIEW**

| Felony Review : | Approved | 27 JUL 2008 19:15 | Gonzalez, Laura | State's Attorneys's Office |
|---|---|---|---|---|

**RECOVERED NARCOTICS**

NO NARCOTICS RECOVERED

**WARRANT**

| Warrant No | Issue Date | Type | NCIC/<br>Leads No | Hold | Bond<br>Amount | Case<br>Docket No | County |
|---|---|---|---|---|---|---|---|
| WG0807310 | 27-JUL-08 | Parole/Mand Violation | | | | | Cook |

Remarks: IDOC ISSUED WARRANT FOR PAROLE VIOLATION IDOC #R20219

## VICTIM AND COMPLAINANT

Name: STATE OF ILLINOIS, P.O. Tews #10773

Injured? No    Deceased? No

DOB:    Hospitalized? No

Age:

Comments:    Treated and Released? No

**NON-OFFENDER(S)**

**ARRESTEE VEHICLE**

| Vehicle: | VEHICLE IMPOUNDED: Yes | | |
|---|---|---|---|
| 1996  Automobile - Volkswagen - Jetta - Hardtop, 4-Door | VIN#:3VWRA81H5TM009959 | Lic#:X176785 | IL |
| Color: Black (Top) / Black (Bottom) | | Inv#: | |
| Pound#: | | | |
| Disposition: | | | |



Santiago, 10 C 4691
0011

**Chicago Police Department - ARREST Report**

CB #: 17313997

SANTIAGO, Javier

## ARREST REPORTING

**PROPERTIES**

**Confiscated Properties :**
All confiscated properties are recorded in the e-Track System. This system can be queried by the inventory number to retrieve all official court documents related to evidence and/or recovered properties.

PROPERTIES INFORMATION FOR     SANTIAGO, Javier,     NOT AVAILABLE IN THE AUTOMATED ARREST SYSTEM.

**INCIDENT NARRATIVE**

(The facts for probable cause to arrest AND to substantiate the charges include, but are not limited to, the following)

EVENT# IN SUMMARY: A/O'S RECEIVED INFORMATION FROM AN ANONYMOUS CONCERNED CITIZEN THAT THE ABOVE ARRESTEE WAS IN POSSESSION OF A HANDGUN. THE CONCERNED CITIZEN RELATED THAT THE ABOVE ARRESTEE WAS A M/4/ WITH LONG BLACK HAIR AND WEARING A BLACK TANK TOP, BLACK SHORTS, AND BLACK GYM SHOES AND WAS IN A BLACK JETTA BEARING PLATE #X176785 WHICH WAS LOCATED AT DAMEN/RICE. ARMED WITH A DESCRIPTION OF THE ARRESTEE AND HIS LOCATION THE 1369 GANG TEAM RE-LOCATED TO THE AREA OF DAMEN AND RICE AND SET UP SURVEILLANCE. WHILE CONDUCTING SURVEILLANCE SGT. RONAN OBSERVED AN INDIVIDUAL FITTING THE DESCRIPTION GIVEN BY THE CITIZEN SITTING IN THE DRIVERS SEAT OF A BLACK JETTA BEARING PLATE X176785 PARKED ON DAMEN FACING NORTH BOUND. AFTER FURTHER SURVEILLANCE THE ABOVE ARRESTEE WAS OBSERVED BY SGT. RONAN TOSS A WRAPPER OUT OF THE WINDOW OF SAID VEHICLE. FURTHER INVESTIGATION REVEALED THAT THE ARRESTEE DID NOT HAVE A VALID DRIVERS LICENSE. THE ARRESTEE THEN PULLED OUT OF HIS PARKING SPACE AND WENT NORTH BOUND ON DAMEN AT WHICH TIME HE WAS CURBED BY A/O'S AT 925 N. DAMEN. ARRESTEE WAS UNABLE TO PRODUCE A VALID DRIVERS LICENSE OR INSURANCE AT WHICH TIME HE WAS TAKEN INTO CUSTODY. SEARCH OF SAID VEHICLE WHICH WAS CONDUCTED BY P.O. TEWS PRODUCED A CHROME REVOLVER LOCATED UNDER THE CENTER CONSOLE OF SAID VEHICLE. ABOVE ARRESTEE WAS TRANSPORTED TO 013TH DISTRICT FOR PROCESSING. NAME CHECK REVEALED HE WAS ON PAROLE FOR ARMED ROBBERY, CLEAR FOR WARRANTS AND INVESTIGATIVE ALERTS VIA LEADS AND I-CLEAR. ARRESTEE JEWELRY INVENTORIED #11372859, PROPERTY #11372842.

SEE WC COMMENTS SECTION FOR ADDITIONAL COMMENTS

**COURT INFO**

Desired Court Date:     04 August 2008
Branch: 42-2     2452 W BELMONT - Room
Court Sgt Handle?  No
Initial Court Date:   28 July 2008
Branch:  1        2600 S CALIFORNIA - Room111
Docket #:

**BOND INFO**

BOND INFORMATION NOT AVAILABLE

**REPORTING PERSONNEL**

**ATTESTING OFFICER:**
I hereby declare and affirm, under penalty of perjury, that the facts stated herein are accurate to the best of my knowledge, information and/or belief.

Attesting Officer:          #5509        MOUSSA, G  (PC0X120)         27 JUL 2008 18:16

**ARRESTING OFFICER(S):**

|  |  |  | Beat |
|---|---|---|---|
| 1st Arresting Officer: | #10773 | TEWS, M J (PC0W596) | 1369A |
| 2nd Arresting Officer: | #5509 | MOUSSA, G  (PC0X120) | 1369A |

**APPROVING SUPERVISOR:**

Approval of Probable Cause : #331        SAHNAS, K  (PC0P683)         27 JUL 2008 18:18

Print Generated By: SIZEMORE, Gail ( PC0E710 )          Page 3 of 5          27 SEP 2010 11:37



Santiago, 10 C 4691
0012

**Chicago Police Department - ARREST Report**

CB #: 17313997

SANTIAGO, Javier

## ARREST PROCESSING REPORT

**Holding Facility:** District 014 Lockup

| | |
|---|---|
| **Received in Lockup:** 27 July 2008 22:27 | **Time Last Fed:** |
| **Prints Taken:** 27 July 2008 22:50 | **Time Called:** Phone#: |
| **Palmprints Taken:** Yes | **Cell #:** 33 |
| **Photograph Taken:** 27 July 2008 22:47 | **Transport Details :** 2PO 2573 27-JUL-2008 15:50 |
| **Released from Lockup:** 28 July 2008 05:25 | |

### VISUAL CHECK OF ARRESTEE

| | | |
|---|---|---|
| Is there obvious pain or injury? | No | |
| Is there obvious signs of infection? | No | |
| Under the influence of alcohol/drugs? | No | |
| Signs of alcohol/drug withdrawal? | No | |
| Appears to be despondent? | No | |
| Appears to be irrational? | No | |
| Carrying medication? | No | |

### ARRESTEE QUESTIONNARIE

| | |
|---|---|
| Presently taking medication? | No |
| (if female)are you pregnant? | No |
| First time ever been arrested? | No |
| Attempted suicide/serious harm? | No |
| Serious medical or mental problems? | No |
| Are you receiving treatment? | No |

**RETURN TO HOLDING FACILITY COMMENTS:**

**QUESTIONNAIRE REMARKS:**

Third Watch.

**LOCKUP KEEPER COMMENTS:**

**EMERGENCY CONTACT**

Name : REFUSED

Res:           Beat:

*LOCKUP KEEPER PROCESSING*

**INTERVIEW LOG**

NO INTERVIEWS LOGGED

**VISITOR LOG**

NO VISITORS LOGGED


powered by: CLEAR Technology

Santiago, 10 C 4691
0013

Chicago Police Department - ARREST Report

CB #: 17313997

SANTIAGO, Javier

**ARREST PROCESSING REPORT**

**MOVEMENT LOG**

MOVEMENT LOG INFORMATION NOT AVAILABLE

**WC COMMENTS**

Watch Commander Comments:

#331    Sahnas, Ken  (PC0P683)

27 JUL 2008 20:05

Warrant issued for Parole Violation -NO BOND WARRANT Warrant # WG-0807310,Charges: 730 ILCS 5/3-13-4,and 730 ILCS, 5/3-14-2. issued by Illinois Dept of Corrections for violation of parole.

**REL w/o CHARGING**

DOES NOT APPLY TO THIS ARREST

**PROCESSING PERSONNEL**

ARRESTEE PROCESSING PERSONNEL:

| | | | | Beat |
|---|---|---|---|---|
| Searched By: | #6530 | HALL, A D (PC0G473) | | |
| Lockup Keeper: | #6530 | HALL, A D (PC0G473) | | |
| Assisting Arresting Officer: | #13447 | LIBOY, N C (PC0W064) | | 1369B |
| Assisting Arresting Officer: | #19034 | DROZD, M K (PC0V726) | | 2573 |
| Assisting Arresting Officer: | #19764 | COLINDRES, A A (PC0Q670) | | 1369B |
| Assisting Arresting Officer: | #2040 | RONAN, S M (PC0G183) | | 1369 |
| Assisting Arresting Officer: | #7993 | SURMA, T A (PC0T605) | | 2573 |
| Fingerprinted By: | | YOUNG, K  (PC0R596) | | |

APPROVAL PERSONNEL:

| | | | | Beat |
|---|---|---|---|---|
| Final Approval of Charges : | #789 | DOWD, D M(PC0P452) | 28 JUL 2008 03:35 | |



Santiago, 10 C 4691
0014

# EXHIBIT J

**Page 1**

```
                        Arr. Date: 8-25-08


IN THE CIRCUIT COURT OF THE COOK JUDICIAL CIRCUIT
     COUNTY DEPARTMENT-FIRST MUNICIPAL DIVISION

THE PEOPLE OF THE           )
STATE OF ILLINOIS,          )
                            )         Branch 42
          Plaintiff,        )
                            )
                            )
vs.                         )         08-126278
                            )
JAVIER SANTIAGO,            )
                            )
          Defendant.        )         UUW

               PRELIMINARY HEARING
     REPORT OF PROCEEDINGS of the hearing before the
Honorable STUART PAUL KATZ had on the 4th day
of August 2008.

     APPEARANCES:
          HON. RICHARD A. DEVINE,
               State's Attorney of Cook County, by
          MR. KENNETH ALPERT,
               Assistant State's Attorney,
               for the Plaintiff;

          HON. EDWIN A. BURNETTE,
               Public Defender of Cook County, by
          MR. JARNAIL KANDA,
               Assistant Public Defender,
               for the Defendant.

Phyllis Yaeger, CSR
Official Court Reporter
#084-002520
                            1
```

**Page 2**

```
     THE CLERK:  Javier Santiago.
          (Witness sworn.)
     MR. ALPERT:  State is asking leave to amend the
charge.
     MR. KANDA:  No objection.
     MR. ALPERT:  For this hearing and this hearing only,
the State and Defense agree to stipulate to that the
defendant has a prior robbery, armed robbery, conviction
under 00 CR 27834.
     MR. KANDA:  So stipulated only for this hearing.
     THE COURT:  That is granted.  That stipulation is
entered into evidence.
               OFFICER TEWS,
called as a witness on behalf of the People of the State
of Illinois, being first duly sworn, was examined and
testified as follows:
               DIRECT EXAMINATION
          BY MR. ALPERT:
     Q    Please state your name, star number, and unit
of assignment?
     A    Officer Tews, star 10773.  I am presently
assigned to the 13th District, Gang Team.
     Q    Directing your attention to July 27, 2008,
around 925 North Damen and the time of 3:45, on that
                            2
```

**Page 3**

```
date, time, and location, did you see anyone then you see
in the courtroom today?
     A    Yes, I did.
     Q    Please point to this individual, indicate an
article of his or her clothing.
     A    The gentleman to my right in the beige DOC
uniform.
     MR. ALPERT:  Indicating the in-court identification
of the defendant for the record.
     THE COURT:  So noted.
     MR. ALPERT:
     Q    On that date, time, and location, was the
defendant pulled over for an Illinois vehicle code
violation?
     MR. KANDA:  Objection.  Leading.
     THE COURT:  Overruled.
     THE WITNESS:  Yes, he was.
     MR. ALPERT:
     Q    And once he was pulled over for that Illinois
vehicle code violation, was he able to produce a valid
driver's license and/or insurance?
     A    No, he was not.
     Q    What happened after he failed to produce those
items?
                            3
```

**Page 4**

```
     A    He was taken into custody.
     Q    After he was placed into custody, what happened
next?
     A    A search was conducted of his vehicle.
     Q    Was that vehicle registered to the defendant?
     A    Yes, it was.
     Q    What, if anything, was found inside the
vehicle?
     A    A chrome .32 caliber revolver.
     Q    Was that loaded?
     A    No, it was not.
     Q    Was there anyone else in the vehicle with the
defendant/driver?
     A    No, there was not.
     Q    And during your investigation, did you learn
that the defendant did not have a valid firearm owner's
identification card?
     A    That's correct.
     Q    And this was on a public way, is that correct?
     A    Yes.
     MR. ALPERT:  Nothing further.
     THE COURT:  Cross.
                            4
```

**Page 5**

```
 1                CROSS EXAMINATION
 2              BY MR. KANDA:
 3       Q   Officer, you did not see this defendant
 4   committing any traffic violations, correct?
 5       MR. ALPERT:  Objection.
 6       THE COURT:  Overruled.
 7       THE WITNESS:  That's correct
 8       MR. KANDA:
 9       Q   And, Officer, you testified on direct
10   examination that the car of the defendant was stopped for
11   the traffic violation, correct?
12       A   That's correct.
13       Q   And what was that traffic violation?
14       MR. ALPERT:  Objection.
15       THE COURT:  Overruled.  You asked.  You opened it
16   up.
17       THE WITNESS:  He littered from the vehicle.
18       MR. KANDA:
19       Q   Did you see my client littering any stuff from
20   the car?
21       A   No.
22       Q   And, Officer, you said when the car was
23   stopped, did you approach from the driver's side or from
24   the passenger side?

                        5
```

**Page 6**

```
 1       A   Driver's side.
 2       Q   Did you see my client sitting on the driver's
 3   seat?
 4       A   Yes, I did.
 5       Q   Did you see any gun on his person?
 6       A   At that time, no.
 7       Q   You said that you asked for the driver's
 8   license, correct?
 9       A   Correct.
10       Q   And did you ask for the driver's license or did
11   your partner ask for the driver's license?
12       A   I believe I asked for a driver's license.
13       Q   You believe.  You are not sure?
14       MR. ALPERT:  Objection.
15       THE COURT:  Sustained.
16       MR. KANDA:
17       Q   Officer, you said that he could not produce a
18   driver's license?
19       A   Correct.
20       Q   After he was placed in custody, who searched
21   the car?
22       A   I did.
23       Q   And when you were standing outside, before you
24   searched the car, you could not see any gun in the car?

                        6
```

**Page 7**

```
 1       MR. ALPERT:  Objection.  Asked and answered.
 2       THE COURT:  Overruled.
 3       THE WITNESS:  That's correct.
 4       MR. KANDA:
 5       Q   Did you see my client placing any gun in the
 6   car?
 7       A   No.
 8       Q   My client didn't make any statement regarding
 9   the ownership of the gun, correct?
10       A   Correct.
11       MR. KANDA:  Judge, I have no further questions.
12              REDIRECT EXAMINATION
13              BY MR. ALPERT:
14       Q   You didn't see him commit an Illinois vehicle
15   code violation but another officer did, is that correct?
16       MR. KANDA:  Objection.  Leading.
17       THE COURT:  Overruled.
18       THE WITNESS:  That's correct.
19       MR. ALPERT:
20       Q   And that led you and other officers to pull
21   over this vehicle, is that correct?
22       A   That's correct.
23       Q   Everything that followed after that happened
24   because of the initial Illinois vehicle code violation,

                        7
```

**Page 8**

```
 1   correct?
 2       A   Correct.
 3       MR. ALPERT:  Nothing further.
 4       THE COURT:  Any cross examination based on that?
 5       MR. KANDA:  I have no further questions.
 6       THE COURT:  Finding of probable cause.  Transfer to
 7   the Chief Judge 8-25-08.
 8          Defendant demands trial.
 9          State, what about --
10       THE CLERK:  Count two, no FOID, felony charge.
11   Finding on that?
12       THE COURT:  Yes.
13       MR. KANDA:  DDT.
14       THE CLERK:  03?
15       THE COURT:  06, felony count or misdemeanor?
16       THE CLERK:  The three is a misdemeanor.
17       THE COURT:  I have that as six?
18       THE CLERK:  Okay.
19       THE COURT:  Three, four, and five are traffic
20   tickets.
21       MR. ALPERT:  Non-suit.
22       THE COURT:  Two of them are State.
23       MR. ALPERT:  Nolle.  Non-suit.
24       THE COURT:  Non-suit and motion state SOL the other

                        8
```

```
 1    two.
 2            What about the defacement?
 3        THE CLERK:  That's a misdemeanor.
 4        MR. ALPERT:  Nolle.
 5        THE COURT:  Motion state nolle.
 6                    (Whereupon, the above-entitled
 7                    cause was continued to 8-25-08
 8                    for arraignment before the
 9                    Presiding Judge of the Criminal
10                    Division.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```
9

```
 1    IN THE CIRCUIT COURT OF THE COOK JUDICIAL CIRCUIT
 2              COOK COUNTY, ILLINOIS
 3
 4
 5
 6
 7
 8        I, PHYLLIS YAEGER, an Official Court Reporter for the
 9    Circuit Court of Cook County, Cook Judicial Circuit of
10    Illinois, do hereby certify that I reported in shorthand
11    the proceedings had on the hearing in the above-entitled
12    cause; that I thereafter caused the foregoing to be
13    transcribed into typewriting, which I hereby certify to
14    be a true and accurate transcript of the proceedings had
15    before the Honorable Judge of said Court.
16
17
18
19
20              Official Court Reporter
21                 #084-002520
22    Dated this 5th day
23    of October 2010.
24
```
10

# EXHIBIT K

**Page 1**

```
 1    IN THE CIRCUIT COURT OF THE COOK JUDICIAL CIRCUIT
 2              COOK COUNTY, ILLINOIS
 3
 4    THE PEOPLE OF THE      )
      STATE OF ILLINOIS      )
 5                           )
           vs.               )    NO. 08 CR 15076-01
 6                           )
      JAVIER SANTIAGO,       )
 7
 8
 9        REPORT OF PROCEEDINGS of the hearing
10    before HON. MICHAEL BROWN, on the 11th day of March
11    2009.
12
13    APPEARANCES:
14        HON. ANITA M. ALVAREZ
              State's Attorney of Cook County, by
15            MS. GERALDINE D'SOUZA,
              MS. ASHLEE CUZA,
16            Assistant State's Attorney,
              appeared for the People;
17
18        MR. ABISHI C. CUNNINGHAM, JR.
              Public Defender of Cook County, by
19            MR. TIMOTHY O'HARA,
              Assistant Public Defender,
20            appeared for the Defendant.
21
22    DIONE R. RAGIN
      2650 S. California Ave., 4C02
23    Chicago IL 60608
      Official Court Reporter
24    C.S.R. #084-004066
```

1

**Page 2**

```
 1                 I N D E X
 2
 3    DATE: March 11, 2009
 4    PAGES: 1 through 50
 5
 6              PROCEEDINGS
 7    OPENING BY MR. O'HARA      4
 8    OPENING BY MS. CUZA        5
 9
10    WITNESS         DX    CX    RDX   RCX
11    GEORGE MOUSSA    7    23    33    39
12
```

2

**Page 3**

```
 1        THE COURT:  Mr. Santiago.
 2        THE DEFENDANT:  Hi, how are you doing?
 3    Good morning.
 4        THE COURT:  Good.
 5        MS. CUZA:  For the record my name is
 6    Ashlee Cuza.  I am a law student licensed under
 7    Illinois Supreme Court Rule 711.  I'm under the
 8    supervision of Assistant State's Attorney Jerry
 9    D'Souza today.
10        MR. O'HARA:  For the record Assistant
11    Public Defender Timothy O'Hara.  I represent Mr.
12    Santiago who is in IDOC custody.  I filed a motion
13    to quash arrest and suppress evidence.  I believe
14    the Court should have a copy.
15        THE COURT:  I do.
16        MR. O'HARA:  I would be answering ready on
17    the motion, Judge.  The only thing is I subpoenaed
18    three Officers to be in court and this was last on
19    the 6th.  There was an Officer Sergeant Ronan that
20    was there on the 6th that's not here today.  I may
21    need to see or may need to have his testimony in
22    order to complete my motion.  There are two
23    Officers here today that we can at least start the
24    motion, Judge.  I may not need Sergeant Ronan, but
```

3

**Page 4**

```
 1    if I do I would ask the Court to continue the
 2    motion.
 3        THE COURT:  All right.  State, are you
 4    answering ready?
 5        MS. CUZA:  Judge, we are ready with the
 6    two Officers that are present.
 7        THE COURT:  Let's use counsel table then.
 8    All right.
 9        Any preliminary matters with regard to the
10    motion.
11        MR. O'HARA:  Just a motion to exclude.
12        MS. CUZA:  We join in that motion, Judge.
13        THE COURT:  Very well.  Any opening
14    statements either side?
15        MR. O'HARA:  Yes, Your Honor.
16        THE COURT:  Very well.
17        MR. O'HARA:  Judge, this case is from
18    July 27th, 2008.  The arrest happened at about 3:45
19    in the afternoon.  You will hear --
20        THE COURT:  I am sorry.  July 27th, '08.
21    At what time.
22        MR. O'HARA:  At 3:45 in the afternoon.
23        THE COURT:  Thank you, sir.
24        MR. O'HARA:  You will hear, Judge, that at
```

4

1    about the intersection or near by the intersection
2    of Damen and Rice that Mr. Santiago was inside of a
3    car.  You will also hear that there was an
4    anonymous tip that was made something about a gun
5    inside of a car at that area.  There was a general
6    description given as far as the exact information
7    that was given in this anonymous tip.  That will
8    become clear at the motion.
9         Judge, it is without corroboration on the
10   tip that was made that these Officers stopped the
11   car that Javier Santiago was in.  There was no
12   firearm that was observed.  There was no firearm
13   that were observed.  There was nothing that would
14   corroborate any allegations that were contained
15   anonymous tip.  I believe Florida V. JL will
16   control in this case, and we ask that you grant the
17   motion.
18        THE COURT: All right. State.
19        MS. CUZA:  Yes, Judge.  The testimony of
20   the police officers will show you that on July 27,
21   2008 a concerned citizen entered the 13th district
22   and spoke with the police officer a desk officer
23   there.  That concerned citizen informed the Officer
24   that a man named Javier Santiago who was a Hispanic

5

1    male with long black hair was in possession of a
2    hand gun on that day.  And the concerned citizen
3    further told the Officer that the defendant was
4    wearing a black tank top, black shorts, and black
5    gym shoes.  The concerned citizen further relates
6    that the defendant would be driving a black
7    Volkswagen Jetta bearing the license plate X
8    176785.  And the defendant would be located near
9    the intersection of Damen and Rice.
10        Police officers reported to that area and
11   confirmed every detail described by that concerned
12   citizen.
13        Further police officers were able to take
14   the license plate number on the car that they
15   observed matching the informants description and
16   run that into a computer system.
17        Based on the search into the computer,
18   system police officers were able to discover that
19   the man in that car was, in fact, Javier Santiago
20   and that he was driving without a valid driver's
21   license.  When police officers observed the
22   defendant toss litter out of his window of his car
23   and drive off, they subsequently pulled him over.
24   Found out that he did not have a valid driver's

6

1    license, place him under arrest, and did, in fact,
2    perform a search of his vehicle and recovered a
3    gun.
4         Based on that, Judge, we ask that you deny
5    the defendant's motion.
6         THE COURT: Mr. O'Hara.
7         MR. O'HARA:  Yes, Judge.  I call Officer
8    Moussa to the stand.
9         THE COURT:  Sir, raise your hand to be
10   sworn.
11        (Witness sworn)
12             GEORGE MOUSSA
13   called as a witness by the State, having first been
14   sworn, was examined and testifies as follows:
15             DIRECT EXAMINATION
16        BY MR. O'HARA:
17   Q.   Good morning, Officer.
18   A.   Good morning, sir.
19   Q.   Would you, please, state your full name
20   and spell your last name for the record.
21   A.   George Moussa, M-o-u-s-s-a, star 5509.
22   Q.   Where are you employed?
23   A.   Chicago Police Department.  Unit 153.
24   Q.   And how long have you been working for the

7

1    CPD?
2    A.   Six years.
3    Q.   What's your current unit of assignment at
4    this point right now?
5    A.   Unit 153 mobile strike force.
6    Q.   Mobile strike force?
7    A.   Yes.
8    Q.   What does that mean?
9    A.   What is a mobile strike force.
10   Q.   Yeah.  What is it?
11   A.   We are a unit that targets high violent
12   areas throughout the City of Chicago.
13   Q.   Were you employed in the mobile strike
14   force on July 27, 2008?
15   A.   No.
16   Q.   How were you employed on that date?
17   A.   I was assigned to the 13th district gang
18   unit.
19   Q.   And were you working alone on July 27.
20   A.   No, I had a partner.
21   Q.   What was your partner's name?
22   A.   Officer Michael Tews.
23   Q.   Is that spelled T-e-w-s?
24   A.   Yes, sir.

8

1    Q.   Now, Officer, at about 3:45 were you on
2    duty?
3    A.   Yes.
4    Q.   Were you in uniform or were you in plain
5    clothes?
6    A.   Plain clothes.
7    Q.   Were you in a marked or unmarked squad
8    car?
9    A.   Unmarked squad car.
10   Q.   Did you have occasion to go to the
11   location of approximately Damen and Rice in the
12   city of Chicago?
13   A.   Yes.
14   Q.   Prior to going to that location did you
15   receive any information about that intersection or
16   about someone located at that intersection?
17   A.   Yes.
18   Q.   How did you resolve that information?
19   A.   I receive that information through my
20   sergeant.
21   Q.   And is that Sergeant Ronan, R-o-n-a-n?
22   A.   Yes.
23        THE COURT:  Is that R-o-n-a-n.
24        THE WITNESS:  Yes, sir.

9

1    Q.   Prior to the call.
2    Q.   That's right?
3    A.   No information at all.
4    Q.   So the reason why you went to that
5    location was specifically based on the call that
6    you received from Sergeant Ronan or excuse me your
7    partner received?
8    A.   Yes.
9    Q.   Did your partner relay the information to
10   you that he had received from Sergeant Ronan?
11   A.   Yes.
12   Q.   What did Officer Tews tell you?
13   A.   Officer Tews said Sergeant said he had
14   information that a person was on a corner of Damen
15   and Rice that was in possession of a handgun in a
16   motor vehicle.
17   Q.   Now, was a description given of that
18   person?
19   A.   Yes.
20   Q.   And before I get to that, did Sergeant
21   Ronan or did Officer Tews tell you how Sergeant
22   Ronan came to that information?
23   A.   Yes, sir.
24   Q.   What did he say?  What did Officer Tews

11

1    BY MR. O'HARA:
2    Q.   Where did this conversation that you had
3    with Sergeant Ronan take place?
4    A.   It took place on the cell phone with my
5    partner.
6    Q.   So he called your partner; is that
7    correct?
8    A.   Yes.
9    Q.   So you yourself did not talk to Sergeant
10   Ronan.
11   A.   No.
12   Q.   Now, do you know how -- what time of day
13   it was when your partner Officer Tews had this
14   conversation with Sergeant Ronan?
15   A.   I'm not sure of the exact time.
16   Q.   About approximately how long before 3:45
17   in the afternoon was it?
18   A.   Oh, I'd say maybe 3:15.
19   Q.   Prior to receiving a call from Sergeant
20   Ronan, did you have any information about activity
21   at the location of Damen and Rice?
22   A.   Yes.
23   Q.   Okay.  And what was that information that
24   you had prior to the call from Sergeant Ronan?

10

1    say?
2    A.   Officer Tews related to me that the
3    information from the desk sergeant at 13th district
4    received information of a gentleman on the corner
5    of Damen and Rice that was in possession of a
6    handgun in his motor vehicle and that we are going
7    over there to check it out.
8    Q.   So let me get this straight.  The desk
9    sergeant told Sergeant Ronan and Sergeant Ronan
10   called Officer Tews.  Is that fair to say?
11   A.   Yes.
12   Q.   And the information was about a person
13   with a handgun?
14   A.   Yes.
15   Q.   Did you relocate or did you go to that
16   intersection of Damen and Rice?
17   A.   No, we went to, I believe, the
18   intersection of Chicago and Hoyne and sat there and
19   waited for further information from Sergeant Ronan.
20   Q.   Were you aware where Sergeant Ronan was?
21   A.   Yes.
22   Q.   Did you receive that information or was
23   Officer Tews?
24   A.   Officer Tews.

12

1    Q.    In the intersection of Chicago and Hoyne
2   is approximately two blocks away from the
3   intersection of Damen and Rice; is that correct?
4    A.    Yes.
5    Q.    Could you see from Chicago and Hoyne an
6   individual located at Damen and Rice?
7    A.    No.
8    Q.    How long did you wait there at Chicago and
9   Hoyne?
10    A.    We waited there until our sergeant
11   informed us on what he wanted us to do and what he
12   was doing.
13    Q.    And you did get a call from the sergeant;
14   is that correct?
15    A.    Yes.  Sergeant was set on a fixed
16   surveillance post at Damen and Rice.
17    Q.    And that's what you found out from Officer
18   Tews who spoke with Sergeant Ronan; is that
19   correct?
20    A.    Yes.
21    Q.    Did you at some point after receiving this
22   latter call from the Sergeant, did you relocate to
23   Damen and Rice?
24    A.    Did I relocate to Damen and Rice?

13

1    Q.    What did the sergeant say on the car to
2   car radio?
3    A.    The sergeant said that at point the
4   subject now is getting into a vehicle.  Just threw
5   a cigarette wrapper outside the vehicle and is
6   going eastbound on Rice to Damen.
7    Q.    In that car to car radio call did Sergeant
8   Ronan say anything about observing a handgun?
9    A.    No.
10    Q.    Did Sergeant Ronan say anything about
11   seeing furtive movements of hiding what he thought
12   to be a handgun?
13    A.    No.
14    Q.    Now, and Sergent Ronan stated over that
15   car to car call the subject was going eastbound on
16   Rice; is that correct?
17    A.    Eastbound on Rice.  Northbound on Damen.
18    Q.    What did you do after you received that
19   car to car call?
20    A.    After that we went down Holman to Iowa
21   eastbound on Iowa and we curbed the vehicle at Iowa
22   and Damen.
23    Q.    So you went northbound on Hoyne; is that
24   correct?

15

1    Q.    From Chicago and Hoyne?
2    A.    No.
3    Q.    So you remained at Chicago and Hoyne the
4   entire time?
5    A.    While Sergeant Ronan was on surveillance,
6   yes.
7    Q.    At some point did you leave Chicago and
8   Hoyne?
9    A.    Yes.
10    Q.    When was that?
11    A.    When Sergeant Ronan observed the
12   individual that we were surveilling.
13    Q.    I will stop you there.  This is now
14   information you are receiving from Officer Tews; is
15   that correct?
16    A.    Now, this is information we are receiving
17   from Officer Tews, and now we are on a car to car
18   radio.
19    Q.    So now you can hear what the sergeant is
20   saying?
21    A.    Yes.
22    Q.    And is this the first time you have
23   actually heard what the sergeant is saying?
24    A.    Yes.

14

1    A.    Uh-huh.
2    Q.    Is that a yes?
3    A.    Yes.
4    Q.    Pass Rice?
5    A.    Pass Rice.
6    Q.    To Iowa?
7    A.    To Iowa.
8    Q.    And then he turned right and went
9   eastbound on Iowa?
10    A.    Eastbound on Iowa.
11    Q.    What did you see when you were going
12   eastbound on Iowa?
13    A.    I didn't see anything eastbound on Iowa.
14    Q.    Did you see a car specifically?
15    A.    We saw the car.  We saw the vehicle that
16   was the description of the vehicle that was given
17   to us on Damen.
18    Q.    It was still on Damen?
19    A.    Yes.
20    Q.    Now, were you driving rapidly at that
21   time?
22    A.    Driving.
23    Q.    Were you driving or was Officer Tews
24   driving?

16

1    A.  Officer Tews was driving I believe.

2    Q.  And so you were the passenger?

3    A.  Yes.

4    Q.  And as you were coming eastbound on Iowa

5 you said you saw a car that had matched a

6 description; is that correct?

7    A.  When we came eastbound on Iowa. When we

8 got the Damen, we stopped our vehicle there. Then

9 we noticed a vehicle that was -- the information on

10 the vehicle that was given us with the handgun and

11 also committed the traffic littering and we curbed

12 the vehicle there.

13    Q.  You hadn't seen the littering yourself;

14 correct?

15    A.  No.

16    Q.  When you got out of your car and you

17 parked it or your parked the car at the

18 intersection of Iowa and Damen; is that correct?

19    A.  Uh-huh.

20    Q.  Is that a yes?

21    A.  Yes.

22    Q.  You got out of your car?

23    A.  We actually pulled on to Damen, got out of

24 our vehicle, and --

17

---

1 today?

2    A.  Yes.

3    Q.  Could you, please, point to him and

4 identify an article clothing?

5    A.  Gentleman wearing the yellow IDOC suit.

6    MR. O'HARA:  Your Honor, I ask that the

7 record reflect in court identification.

8    THE COURT:  Very well.

9 BY MR. O'HARA:

10    Q.  You said that black Jetta was stopped; is

11 that correct?

12    A.  Yes.

13    Q.  What, if anything, did you see Mr.

14 Santiago doing out of that car?

15    A.  At that point nothing.

16    Q.  Did you see a gun?

17    A.  No.

18    Q.  Did you see any furtive movements that you

19 thought to be him hiding a gun?

20    A.  No.

21    Q.  Did you have your gun drawn?

22    A.  I had my gun at a low ready.

23    Q.  So it was out?

24    A.  Yes.

19

---

1    Q.  When you got out of the vehicle, did you

2 see a car?

3    A.  Yes.

4    Q.  Was the car moving?

5    A.  No.

6    Q.  It was parked?

7    A.  It was stopped.

8    Q.  Where was it stopped?

9    A.  In front of our vehicle.

10    Q.  Go ahead.

11    A.  No, go ahead.

12    Q.  Did your car pull in front of this other

13 vehicle?

14    A.  Yes.

15    Q.  Was it blocking the vehicle's movement?

16    A.  Yes.

17    Q.  And the other car that we are speaking of,

18 is that a black Jetta?

19    A.  Yes.

20    Q.  Did you see who was driving that black

21 Jetta?

22    A.  Yes.

23    Q.  Do you see that individual that was

24 driving the black Jetta do you see him in court

18

---

1    Q.  And what did you do?

2    A.  At that point I moved into a position to

3 cover my partner, my partner approached the

4 driver's side of the vehicle.

5    Q.  And which side -- were you behind Officer

6 Tews at that time?

7    A.  I was on the side of Officer Tews.

8    Q.  Was Officer Ronan near by this car at that

9 time?

10    A.  Officer Ronan was approaching from behind.

11    Q.  From the south?

12    A.  From the south.

13    Q.  What did you see happen as you both

14 approached the car?

15    A.  Officer Tews walked to the driver's side

16 of the vehicle. They asked to -- if he had license

17 and insurance which the defendant could not

18 produce. We had the gentleman step out of the

19 vehicle, and we placed him in custody at that

20 point.

21    Q.  Now, prior to Officer Tews asking for

22 license and insurance, did you say anything to Mr.

23 Santiago?

24    A.  No.

20

1    Q.   Did Officer Tews say anything to Mr.
2  Santiago?
3    A.   I believe the only thing Officer Tews said
4  was asked for a driver's license and insurance.
5    Q.   At this point though his car was blocked
6  by your car; is that correct?
7    A.   Yes.
8    Q.   Now, how far away was your car from his
9  car?
10   A.   Couple feet.
11   Q.   Now, did you or your partner place Mr.
12  Santiago under arrest?
13   A.   Yes.
14   Q.   You then conduct a search of the car?
15   A.   My partner conducted a search of the
16  vehicle.
17   Q.   Did you observe your partner recover
18  anything?
19   A.   Yes.
20   Q.   Where did your partner recover -- what did
21  you observe him to recover?
22   A.   My partner recovered a steel revolver
23  handgun from underneath the center console of the
24  vehicle.

                        21

1         MS. CUZA:  Objection.
2         THE COURT:  Well, basis of the objection?
3         MS. CUZA:  Relevance, Judge.
4         THE COURT:  Counsel, how is this relevant.
5         MR. O'HARA:  It just goes to whether or
6  not a violation occurred.
7         THE COURT:  I will allow the testimony.
8  BY MR. O'HARA:
9    Q.   Did you issue any traffic violations to
10  Mr. Santiago?
11   A.   Officer Tews issued the traffic citations
12  to Mr. Santiago.
13   Q.   You said plural citations were issued?
14   A.   Yes.
15   Q.   Was that for driving without a license?
16   A.   Yes.
17        MR. O'HARA:  Thank you, Officer.  That's
18  all I have of the witness.
19        THE COURT:  Cross.
20        CROSS EXAMINATION
21        BY MS. CUZA:
22   Q.   Officer Moussa, on July 27, 2008 you were
23  working in your capacity as a Chicago Police
24  Officer?

                        23

1    Q.   When you say the center console, what do
2  you mean?
3    A.   Center console where you -- center
4  console.
5    Q.   Is it a part that is between the driver
6  side and the passenger side?
7    A.   Yes, right in the middle.
8    Q.   It was below the -- what level was the
9  center console.  Was it below the level of the door
10  or was it about arm level or shoulder level?
11   A.   It was probably at arm level.
12   Q.   To your knowledge did Mr. Santiago have
13  any warrants out for his arrest that day?
14   A.   No.
15        MR. O'HARA:  May I just have a moment?
16        THE COURT:  Sure.
17  BY MR. O'HARA:
18   Q.   Officer, prior to you pulling your car in
19  front of Mr. Santiago's car, did you observe any
20  traffic violations?
21   A.   No.
22   Q.   And no tickets were issued in this case;
23  is that correct?
24   A.   Yes.

                        22

1    A.   Yes, ma'am.
2    Q.   And on that day you were working with
3  Officer Tews; is that correct?
4    A.   Yes, ma'am.
5    Q.   The two of you were in an unmarked car;
6  correct?
7    A.   Yes.
8    Q.   You were in plain clothes?
9    A.   Yes, ma'am.
10   Q.   And on that day you were working for the
11  13th district; is that correct?
12   A.   Yes.
13   Q.   Around 3:15 in the afternoon you received
14  -- your partner Officer Tews received a call from
15  Sergeant Ronan; is that right?
16   A.   Yes, ma'am.
17   Q.   And Sergeant Ronan informed Officer Tews
18  that he had received a phone call from the desk
19  sergeant at the 13th district; is that right?
20   A.   Yes, ma'am.
21        MR. O'HARA:  Judge, I'm going to object as
22  to the testimony that occurred between Sergeant
23  Ronan and Officer Tews as being outside the scope
24  of this witness's foundation.

                        24

1     THE COURT:  Well, you brought this out on
2  direct examination that he learned from Officer
3  Tews that Officer Tews was told by Sergeant Ronan
4  these things.  And so it's just a rehash of what I
5  have heard on direct.
6     MR. O'HARA:  Judge, my objection is as to
7  the form of the question that what Sergeant Ronan
8  told the Officer Tews he only knows because Officer
9  Tews told him so.
10     THE COURT:  And I understand it your for
11  that purpose.  Objection overruled.
12  BY MS. CUZA:
13     Q.   Officer Tews relayed to you that Officer
14  Ronan had informed him that the desk sergeant said
15  a citizen entered the 13th district on that day?
16     A.   Yes, ma'am.
17     Q.   And the citizen didn't wish do reveal his
18  or his her name at that time; is that correct?
19     A.   No, ma'am.
20     Q.   But the citizen had approached the desk
21  sergeant at the police station?
22     A.   Yes, ma'am.
23     Q.   And the citizen told the desk sergeant
24  that a man named Javier Santiago was in possession

25

1  intersection of Damen and Rice?
2     A.   Yes, ma'am.
3     Q.   Officer Ronan told Officer Tews that based
4  on that information he reported to the area of
5  Damen and Rice; is that right?
6     A.   Yes, ma'am.
7     Q.   In fact, Sergeant Ronan set up
8  surveillance at the intersection of Damen and Rice.
9     A.   Yes, ma'am.
10     Q.   He set up surveillance in the second story
11  of a building located on the corner of Damen and
12  Rice?
13     A.   Yes, ma'am.
14     Q.   And Officer Ronan told Officer Tews that
15  from his position in the building on the corner of
16  Damen and Rice he could see a man fitting the
17  description given by the informant; is that
18  correct?
19     A.   Yes, ma'am.
20     Q.   In fact, Officer Ronan told Officer Tews
21  that he could see a Hispanic male; correct?
22     A.   Yes, ma'am.
23     Q.   And that that Hispanic male was wearing a
24  black tank top?

27

1  of a handgun; is that right?
2     A.   Yes, ma'am.
3     Q.   And the citizen informed the desk Sergeant
4  that this man Javier Santiago was a Hispanic male;
5  is that correct?
6     A.   Yes, ma'am.
7     Q.   And the citizen informed the desk sergeant
8  that Javier Santiago would be wearing a black tank
9  top?
10     A.   Yes, ma'am.
11     Q.   And black shorts?
12     A.   Yes, ma'am.
13     Q.   Also black gym shoes?
14     A.   Yes, ma'am.
15     Q.   And the concerned citizen also informed
16  the desk sergeant that Javier Santiago informed the
17  desk sergeant that Javier Santiago would be driving
18  a black Volkswagen Jetta?
19     A.   Yes.
20     Q.   And that Jetta would have a license plate
21  number X 176 785?
22     A.   Yes, ma'am.
23     Q.   The concerned citizen told the desk
24  sergeant that he would be found near the

26

1     A.   Yes, ma'am.
2     Q.   Black shorts?
3     A.   Yes, ma'am.
4     Q.   Black shoes?
5     A.   Yes, ma'am.
6     Q.   And that he was sitting in the driver's
7  seat of the black Volkswagen Jetta?
8     A.   Yes, ma'am.
9     Q.   And that Jetta had the license plate
10  number of X 176 785?
11     A.   Yes, ma'am.
12     Q.   And that Jetta was parked on the side of
13  Damen near the corner of Damen and Rice?
14     A.   Yes, ma'am.
15     Q.   Based on that information you and your
16  partner relocated; correct?
17     A.   Yes, ma'am.
18     Q.   You relocated to approximately a block
19  away?
20     A.   Two blocks away.  Hoyne and Chicago.
21     Q.   And at that area when you arrived at that
22  location you performed a computer search; is that
23  correct?
24     A.   Yes, ma'am.

28

1     Q.   In fact, you ran the license plate number

2  X 176 785 into the leads computer system?

3     A.   Yes, ma'am.

4     Q.   And the leads computer system revealed

5  that the license plate of that car was registered

6  to a man named Javier Santiago?

7     A.   Yes, ma'am.

8     Q.   You took that information and you entered

9  it into another computer database called I-clear;

10  is that correct?

11     A.   Yes, ma'am.

12     Q.   And I-clear revealed that Javier Santiago

13  with this license plate number had a specific birth

14  birthday; is that correct?

15     A.   Yes, ma'am.

16     Q.   You took that information and entered it

17  back into the leads system again?

18     A.   Yes, ma'am.

19     Q.   And the leads system then showed you an

20  arrest report; is that correct?

21     A.   The leads system gives us a print out of

22  the individual that we were searching if he had a

23  valid driver's license.  Also came up that he was

24  active.  He was active on parole.  Also came up he

29

1  had an officer safety alert for gang member.

2     Q.   So that information in the leads system

3  told you that this man did not -- Javier Santiago

4  did not have a driver's license?

5     A.   Did not.

6     Q.   In fact, told you that this man had never

7  been issued a license; is that correct?

8     A.   Yes, ma'am.

9     Q.   And also told you that he was on parole?

10     A.   Yes, ma'am.

11     Q.   You were also able to view a photo of

12  Javier Santiago on that system?

13     A.   Not the leads system.  From the I-clear.

14     Q.   From the I-clear system?

15     A.   Yes, ma'am.

16     Q.   And did you describe that photo to -- or

17  did -- I am sorry.  Did Officer Tews describe that

18  photo to Officer Ronan?

19     A.   Yes, ma'am.

20     Q.   And did Officer Ronan confirm that that

21  matched the description of the individual that he

22  was observing?

23     A.   Yes, ma'am.

24     Q.   Officer Ronan then made a radio call to

30

1  your car?

2     A.   Yes, ma'am.

3     Q.   Officer Ronan told you that he observed

4  the individual in his car; correct?

5     A.   Yes, ma'am.

6     Q.   Toss a packaging of cigarette wrapper out

7  of his car window; is that right?

8     A.   Yes, ma'am.

9     Q.   Officer Ronan, then told you that he saw

10  this man driving northbound on Damen; is that

11  right?

12     A.   Yes, ma'am.

13     Q.   At which time you and your partner

14  relocated; correct?

15     A.   Yes, ma'am.

16     Q.   You drove north on Hoyne and then you

17  drove east on Iowa?

18     A.   Yes, ma'am.

19     Q.   And you curbed the vehicle at that

20  location?

21     A.   Yes, ma'am.

22     Q.   In fact, you curbed the defendant from the

23  front; correct?

24     A.   Yes, ma'am.  On Damen off of Iowa.

31

1     Q.   And Officer Ronan came up from behind; is

2  that correct?

3     A.   Yes, ma'am.

4     Q.   You and your partner Officer Tews

5  approached the driver's side of the defendant's

6  vehicle?

7     A.   Yes, ma'am.

8     Q.   Your partner asked the defendant for

9  license and registration?

10     A.   Yes.  License and insurance.

11     Q.   License and insurance?

12     A.   Yes, ma'am.

13     Q.   The defendant was not able to produce

14  license and insurance to Officer Tews?

15     A.   No, ma'am?

16     Q.   At which point you placed the defendant

17  under arrest?

18     A.   Yes, ma'am.

19     Q.   And you placed the defendant under arrest

20  for driving without a valid driver license?

21     A.   And insurance and the littering.

22     Q.   Subsequently Officer Tews performed a

23  search of the defendant's vehicle; correct?

24     A.   Yes, ma'am.

32

1    Q.   Officer Tews was able to recover or
2    recovered a chrome revolver from the defendant's
3    car?
4    A.   Yes, ma'am.
5         MS. CUZA:  Can I have a moment, Judge?
6         THE COURT:  Sure.
7    BY MS. CUZA:
8    Q.   Officer, how did you know that the
9    photograph you viewed on leads was the photograph
10   of the defendant?
11   A.   How did I know?
12   Q.   Let me rephrase.  Were you able to confirm
13   once you pulled the defendant over that that
14   photograph was, in fact, the same person that you
15   viewed in the car?
16   A.   Yes, ma'am.
17        MS. CUZA:  Nothing else, Judge.
18        THE COURT:  Redirect.
19        MR. O'HARA:  Yes, Your Honor.
20             REDIRECT EXAMINATION
21             BY MR. O'HARA:
22   Q.   Officer, the information that you're
23   receiving from Officer Tews had been delivered to
24   him by Sergeant Ronan?  Right?

                    33

1    A.   Oh, I have no idea.
2    Q.   And Sergeant Ronan didn't have any idea
3    that this individual had been used before?  Right?
4    A.   Yeah.  All we know it was a citizen that
5    walked into the 13th district station, talked to
6    the desk sergeant.
7    Q.   And you didn't know if that citizen's
8    information was true or not at the point that you
9    received it; correct?
10   A.   No.
11   Q.   Now, do you know when this visit occurred
12   to the 13th district by this anonymous citizen?
13   A.   I do not.
14   Q.   And to your knowledge did Officer Ronan
15   tell Officer Tews about when this individual had
16   gone into the police station at the 13th district?
17   A.   I couldn't answer that question, sir.
18   Q.   So how long before 3:45 would you be
19   unable to tell the Court about when exactly that
20   information was received by Officer Ronan or
21   Sergeant Ronan?
22   A.   Well, when Sergeant Ronan received the
23   information he immediately contacted us.
24   Q.   So it's when the desk sergeant notified

                    35

1    A.   Yes.
2    Q.   And that information had been delivered
3    from Sergeant Ronan by the desk sergeant?  Right?
4    A.   Yes.
5    Q.   And I want to talk about that initial
6    information that information about the meeting at
7    the 13th district that some anonymous citizen had.
8    There was no name given of that individual;
9    correct?
10   A.   I don't know.  I was not there at the -- I
11   wasn't in the 13th district.
12   Q.   Right.  Because you weren't there so you
13   didn't know if there was a name that was given;
14   Right?
15   A.   Yes, sir.
16   Q.   The information that you received was that
17   this was an anonymous citizen; correct?
18   A.   Yes.
19   Q.   A person did not want to give their name?
20   Right?
21   A.   Yes.
22   Q.   And that this citizen you didn't know if
23   that citizen had been used before as an informant?
24   Right?

                    34

1    Sergeant Ronan that we don't know when that
2    happened; correct?
3    A.   Yes.
4    Q.   Now, you testified that you had a picture
5    of Javier Santiago; is that correct?
6    A.   Yes.
7    Q.   And did the anonymous citizen give the
8    desk sergeant a name?
9    A.   A name.
10   Q.   And a date of birth?
11   A.   I don't know about the date of birth.
12   Q.   But in any event you testified that you
13   searched first the leads system; is that correct?
14   A.   Searched first the I-clear.
15   Q.   You searched I-clear first?
16   A.   First we did the leads.  We ran the plate
17   of the vehicle on the leads to get the information
18   back of the vehicle and then from there we went to
19   I-clear.
20   Q.   Now, it's your testimony that that was
21   done right at the same time or within a few
22   minutes?
23   A.   Yes.
24   Q.   So the plate number was run prior to his

                    36

1    arrest, is that correct, is that your testimony?
2       A.   Plate of the vehicle.
3       Q.   Yes.
4       A.   The information received on the vehicle we
5    ran that plate.
6       Q.   All right.  Now, in that was -- you didn't
7    have his date of birth though prior to running the
8    plate number; is that correct?
9       A.   Yes.
10       Q.   You said there was a picture that was on
11   the I-clear system?
12       A.   Yes.
13       Q.   That was in your car?
14       A.   Yes.
15       Q.   Not in Sergeant Ronan's car?
16       A.   No.
17       Q.   So then you or Officer Tews had to
18   describe to Sergeant Ronan the picture; is that
19   correct?
20       A.   Well, Sergeant Ronan described when we
21   first received the call he described the individual
22   to Officer Tews which then we went to I-clear and
23   pulled up that person that we were looking for.
24       Q.   To your knowledge Sergeant Ronan didn't

                              37

1    have a picture of the individual himself; correct?
2       A.   I am a not sure.  He could have pulled it
3    up on I-clear also.  He has the same access to it
4    in his vehicle that we do.
5       Q.   But to your knowledge you didn't -- he
6    didn't tell you that he was looking at a picture on
7    I-clear?  Right?
8       A.   No.
9       Q.   And you filled out a police report in this
10   case?
11       A.   Yes.
12       Q.   The police report -- the arrest report?
13       A.   Yes.
14       Q.   And you were the Attesting Officer?
15       A.   Yes.
16       Q.   And there is a quite a large narrative
17   section in the arrest report?
18       A.   Yes.
19       Q.   And in that narrative section you never
20   mentioned that you observed a photo of Mr. Santiago
21   on the I-clear system?  Right?
22       A.   I don't think so.
23       Q.   Would you like to see a copy of your
24   report?

                              38

1       A.   Yeah, sure if you want to.
2            MR. O'HARA:  I will mark this as
3    Defense 1.  May I approach, Your Honor?
4            THE COURT:  Sure.
5    BY MR. O'HARA:
6       Q.   I am showing you what I have marked as
7    Defense Exhibit Number 1.  That's your arrest
8    report; correct?
9       A.   Yes.
10       Q.   Go ahead and review the report.
11       A.   No, it's not in there.
12       Q.   Thank you.
13            MR. O'HARA:  May I just have one moment?
14            THE COURT:  Sure.
15            MR. O'HARA:  Judge, that's all I have.
16   Thank you.
17            THE COURT:  Recross.
18            MS. CUZA:  Briefly, Judge.
19                 CROSS EXAMINATION
20              BY MS. CUZA:
21       Q.   Officer, in the narrative of that same
22   arrest report you indicated that further
23   investigation revealed that the arrestee did not
24   have a valid driver's license; correct?

                              39

1       A.   Yes.
2       Q.   And part of that further investigation
3    involved going into the I-clear system; correct?
4       A.   I-clear and leads.
5       Q.   And going into the I-clear system is what
6    revealed that photo; correct?
7       A.   Yes.
8            MS. CUZA:  Nothing else, Judge.
9            THE COURT:  Very well.  Just a minute
10   please.
11            Officer, couple questions about your
12   testimony.  If I understand your testimony
13   correctly once you got to Damen and Iowa Mr.
14   Santiago's car was already stopped.
15            THE WITNESS:  No, Mr. Santiago was driving
16   northbound on Damen.
17            THE COURT:  And so you stopped it?
18            THE WITNESS:  We stopped it.
19            THE COURT:  You saw Mr. Santiago driving?
20            THE WITNESS:  Yes.
21            THE COURT:  All right.  Also you said that
22   your partner searched the car and that a revolver
23   was found under the center console; is that what
24   you testified to?

                              40

1     THE WITNESS: Yes.

2     THE COURT: All right. Tell me what you

3 mean by that. Are you saying inside the console or

4 underneath the console.

5     THE WITNESS: My partner went inside the

6 console. We didn't find anything. As we were

7 searching, we went into the backseat and noticed

8 that center console was loose. At which point he

9 lifted up the center console from the bottom of the

10 floor which was not tied down by any bolts or

11 anything. And when that lifted up, the pistol --

12 or excuse me. The handgun was laying on the carpet

13 underneath the center console.

14     THE COURT: All right. Any questions

15 based on the Court's questions?

16     MR. O'HARA: No, Judge.

17     THE COURT: State.

18     MS. CUZA: Nothing, Judge. Thank you.

19     THE COURT: Officer. Thank you for your

20 testimony. You are excused from the witness stand.

21 Mr. O'Hara.

22     MR. O'HARA: I have no further witnesses.

23 The petitioner would rest.

24     THE COURT: Petitioner rests. State.

41

1     MS. CUZA: Judge, at this time I'd like to

2 make a motion for directed finding.

3     THE COURT: Very well. Any argument on

4 that motion?

5     MS. CUZA: No, Judge.

6     THE COURT: Mr. O'Hara, anything?

7     MR. O'HARA: No, Judge.

8     THE COURT: All right. I have considered

9 the motion for directed finding and I find that as

10 follows: I find that Mr. Santiago had a

11 constitutionally protected interest in himself and

12 the automobile that he was driving back on July 27,

13 2008. I find that that constitutional right was

14 intruded upon when police officers curbed Mr.

15 Santiago driving that vehicle on or about Damen and

16 Iowa. And at that point Mr. Santiago's

17 constitutional rights were intruded upon. I find

18 that of there was justification for intruding upon

19 Mr. Santiago's constitutional rights.

20     I find that the justification was based on

21 the testimony that I have heard Sergeant Ronan

22 personally was aware that Mr. Santiago committed

23 the offense of littering. The Court takes judicial

24 notice that under Section 415 ILCS 105-4 littering

42

1 which is the throwing of any piece of garbage on

2 any public way is a class B felony.

3     MR. O'HARA: Felony.

4     THE COURT: I am sorry. Class B

5 misdemeanor. And as a result of -- because

6 Sergeant observed Mr. Santiago commit a class B

7 misdemeanor he does have the authority under 725

8 ILCS 107-4A3 to arrest Mr. Santiago. The fact that

9 Mr. Santiago drove away for a period of time and

10 was curbed at another location from where he

11 committed this misdemeanor offenses of no moment.

12 Probable cause to make an arrest for that

13 misdemeanor is developed then. Mr. Santiago's

14 vehicle was curbed.

15     I think under the circumstance even if you

16 look at the anonymous tip and that information

17 being confirmed Mr. Santiago was driving a vehicle.

18 The vehicle was curbed. I think it's reasonable

19 for the police to ask for a driver's license and

20 registration. Under the circumstances Mr. Santiago

21 couldn't produce that. Mr. Santiago was placed

22 under arrest for failure to produce a valid

23 driver's license.

24     I find that it was probable cause to

43

1 arrest Mr. Santiago. The question then becomes

2 whether or not the search of the automobile was a

3 search incident to an arrest. It would appear that

4 the search was immediate and contemporaneous with

5 the search with the arrest of Mr. Santiago.

6     As such I do find that the search was

7 incident to the arrest of Mr. Santiago such that it

8 is and as a result I don't find that Mr.

9 Santiago's constitutional rights were violated. So

10 with that the motion to quash arrest and suppress

11 evidence will be granted.

12     Do you need time to speak with your

13 client, Mr. O'Hara, about how you want to proceed

14 in this case?

15     MR. O'HARA: Judge, if we can pass this

16 briefly.

17     THE COURT: Sure. Pass the case briefly

18     (Whereupon the matter was passed and

19     recalled)

20     THE COURT: All right. Recall of the

21 Santiago matter. Mr. O'Hara.

22     MR. O'HARA: Your Honor, at this time I

23 would be requesting that Mr. Santiago sign a jury

24 waiver.

44

1      THE COURT: All right. Mr. Santiago, you
2  have a personal constitutional right to decide what
3  kind of trial you wish to have. You can have a
4  jury trial where 12 citizens are selected. They
5  will determine whether or not the State can meet
6  its burden of proof. You can waive your right to a
7  jury and have a bench trial. And in a bench trial
8  I decide whether or not the State meets its burden
9  of proof.
10      Have you decided what kind of trial you
11  want to have? Bench trial, sir?
12      THE DEFENDANT: Yes.
13      THE COURT: Mr. Santiago, I have a
14  document that says you waive your right to a jury
15  trial. This is your signature on the document?
16      THE DEFENDANT: Yes.
17      THE COURT: Now, I find that you freely
18  and voluntarily, knowingly, and intelligently waive
19  your right to a jury trial. I will accept the jury
20  waiver. All right.
21      I will adopt the testimony taken at the
22  motion, State.
23      MS. D'SOUZA: We do have some additional
24  evidence.

45

1      THE COURT: As far as the evidence taken
2  at the motion I'll adopt that.
3      MS. CUZA: Yes.
4      THE COURT: Mr. O'Hara?
5      MR. O'HARA: No objection, Judge.
6      THE COURT: All right. Additional
7  evidence State.
8      MS. CUZA: Yes, Judge. At this time we
9  would be entering as People Number 1, vehicle
10  records that prove that the Defendant Javier
11  Santiago is the registered owner of the vehicle in
12  question.
13      THE COURT: All right. Judge, we would
14  also be entering as People Number 2 a certified
15  copy of conviction for case number 00 CR 27834 that
16  shows that the defendant was convicted for the
17  offense of armed robbery.
18      All right. Any objection to those
19  exhibits, Mr. O'Hara?
20      MR. O'HARA: I would object for the record
21  to the vehicle records.
22      THE COURT: All right. These are
23  certified copies from the Secretary of State.
24      MS. CUZA: Yes, Judge.

46

1      THE COURT: Over their objection, they
2  will be admitted.
3      Any other evidence, State.
4      MS. CUZA: Judge, can we briefly call one
5  of the Officers.
6      THE COURT: For what purpose.
7      MS. CUZA: To establish that he did not
8  have a valid firearm owner's identification card.
9      MR. O'HARA: I will stipulate that he did
10  not have a valid firearm FOID card.
11      THE COURT: Stip. No FOID card.
12      Anything else?
13      MS. CUZA: That's all, Judge.
14      THE COURT: State rests.
15      MS. CUZA: Yes, Judge.
16      THE COURT: Mr. O'Hara.
17      MR. O'HARA: Judge, I have no testimony.
18  I would like to just say one brief thing in
19  argument.
20      THE COURT: Very well.
21      MR. O'HARA: Based on the location where
22  this gun was found, Judge, I don't believe that
23  there is any intent that the State has established.
24  Furthermore, the vehicle records that the State has

47

1  just introduced over the defense objection says
2  that, I believe, says that the active date for the
3  registration is 7/21/08 which is one week before
4  the arrest in this case. So the vehicle was very
5  very recently if the Court considers it to be in
6  his ownership was very very recently in his
7  ownership. So, Judge, I don't believe the State
8  has met their burden and we ask you to find him not
9  guilty.
10      MS. CUZA: Judge, the defendant was
11  driving the vehicle at the time and it was
12  registered in his name at the time he was pulled
13  over. The gun was recovered under the center
14  console which was in the immediate grabbing area of
15  the defendant. Based on that we ask that you find
16  the defendant guilty.
17      THE COURT: All right. I have considered
18  the evidence in this matter.
19      Mr. Santiago, somebody had your number
20  that day. Someone had your number. They knew
21  exactly what to do in order to get you picked up by
22  the police. And the testimony that I have heard
23  indicates that someone had your number, went to the
24  police, described you, your car, where you'd be,

48

1    and that a gun could be found in your car.  Based
2    on the location of where the gun was, I find that
3    the State has not met its burden of proof with
4    regards to the knowledge element.
5           If it had been found inside the center
6    console different story.  But in order to find the
7    gun you had to lift up console from the back and it
8    was underneath the console.
9           I find based on that evidence that the
10   State hadn't met its burden of proof with regards
11   to knowing possession.  As a result it will be a
12   finding not guilty.
13          Defendant discharged this case.
14          THE DEFENDANT:  Thank you very much.
15   Thank you, Your Honor.
16          MS. D'SOUZA:  We ask for a confiscate and
17   destroy order on the weapon.
18          THE COURT:  C and D order allowed.
19              (Which were all the proceedings
20              had in the above entitled cause)
21
22
23
24

                              49


1         IN THE CIRCUIT COURT OF THE COOK JUDICIAL CIRCUIT
2                      COOK COUNTY, ILLINOIS
3
4
5
6         I, DIONE R. RAGIN, Official Court Reporter of
7    the Circuit Court of Cook County, do hereby certify
8    that I reported the proceedings had in the
9    above-entitled cause, that I thereafter caused the
10   foregoing to be transcribed into typewriting, which
11   I hereby certify to be a true and accurate
12   transcript of the proceedings had on this date.
13
14
15
16   _____
17   DIONE R. RAGIN,
     Official Court Reporter
     #084-004066
18
19
20
21
22
23
24

                              50

# EXHIBIT L

A505DFF
**THOMAS SURMA      JUNE 24, 2011**

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                 NORTHERN DISTRICT OF ILLINOIS

 3                       EASTERN DIVISION

 4

 5      JAVIER SANTIAGO,              )

 6              Plaintiff,            )

 7          vs.                      ) No. 10 CV 4691

 8      Sean Ronan, Thomas Surma,    )

 9      Michael Tews, et al.,        )

10              Defendants.          )

11

12

13

14              DISCOVERY DEPOSITION OF

15                   THOMAS SURMA

16                 CHICAGO, ILLINOIS

17                  JUNE 24, 2011

18
        ATKINSON-BAKER, INC.
19      COURT REPORTERS
        (800) 288-3376
20      www.depo.com

21

22      REPORTED BY:  DONNA J. SMUDA, CSR NO. 084-004257

23      FILE NO:  A505DFF

24
```

A505DFF

**THOMAS SURMA          JUNE 24, 2011**

---

**Page 2**

```
 1        IN THE UNITED STATES DISTRICT COURT
 2        NORTHERN DISTRICT OF ILLINOIS
 3             EASTERN DIVISION
 4
 5   JAVIER SANTIAGO,        )
 6        Plaintiff,         )
 7        vs.                ) No. 10 CV 4691
 8   Sean Ronan, Thomas Surma, )
 9   Michael Tews, et al.,   )
10        Defendants.        )
11
12
13
14        Discovery deposition of THOMAS SURMA,
15   taken on behalf of Plaintiff, at 20 South Clark
16   Street, Suite 500, Chicago, Illinois, commencing
17   at 2:15 p.m., Friday, June 24, 2011, before
18   Donna J. Smuda, CSR No. 084-004257.
19
20
21
22
23
24
```

---

**Page 4**

```
 1             I N D E X
 2   WITNESS                  EXAMINATION
 3   THOMAS SURMA
 4      By Ms. Baumann             5
 5
 6
 7
 8
 9
10             E X H I B I T S
11   NUMBER                 MARKED FOR ID
12
13
14
15
16
17        (NO EXHIBITS MARKED)
18
19
20
21
22
23
24
```

---

**Page 3**

```
 1   APPEARANCES:
 2     BAUMANN & SHULDINER
 3     BY:  MS. DEIDRE BAUMANN
 4        20 South Clark Street
 5        Suite 500
 6        Chicago, Illinois  60603
 7        (312) 558-3119
 8           Representing the Plaintiff;
 9
10     CITY OF CHICAGO
11     FEDERAL CIVIL RIGHTS LITIGATION DIVISION
12     BY:  MS. ANNE K. PRESTON
13           -and-
14        MR. CHRISTOPHER WALLACE
15        30 North LaSalle Street
16        Suite 900
17        Chicago, Illinois  60602
18        (312) 742-4045
19           Representing the Defendants.
20
21   ALSO PRESENT:
22     Mr. Sean Ronan
23     Mr. Michael Tews
24
```

---

**Page 5**

```
 1            (Whereupon, the witness was
 2             duly sworn.)
 3            THOMAS SURMA,
 4   called as a witness herein, was examined and
 5   testified as follows:
 6            EXAMINATION
 7   BY MS. BAUMANN:
 8      Q. State your name, please.
 9      A. Thomas Adam Surma, S-U-R-M-A.
10      Q. Where do you work?
11      A. Chicago police department.
12      Q. In what capacity?
13      A. I do field investigations.  I'm in the
14   intelligence section of the Chicago police
15   department.
16      Q. And how long have you been doing that?
17      A. I have been doing that -- it will be
18   three years this December.
19      Q. Is that what you were doing July 27,
20   2008?
21      A. No, I was not.  At that time I was
22   assigned to the 25th District.
23      Q. What were you doing at 25?
24      A. Basically I was working a 2506 car or
```

2 (Pages 2 to 5)

**ATKINSON-BAKER, INC., COURT REPORTERS**          **(800) 288-3376**

A505DFF
**THOMAS SURMA          JUNE 24, 2011**

1  basically a beat car.
2      **Q. What was your involvement with this**
3  **particular incident with Mr. Santiago?**
4      A. This particular involvement, we were
5  working a squadral that day, which I believe was
6  beat 257, which is the wagon. We were coming
7  back from a prisoner transport somewhere in the
8  downtown area. We were driving down Damen.
9  Basically, we were waved down by these officers.
10     **Q. Would it be common practice for you as a**
11 **driver of a squadral to be waved down from**
12 **someone from another district?**
13     MS. PRESTON: Objection, vague.
14 BY THE WITNESS:
15     A. It's a courtesy. If we observe them
16 having a traffic stop, we just wave to them to
17 see if everything was okay for safety reasons.
18 BY MS. BAUMANN:
19     **Q. When you drove by, what did see?**
20     A. I observed a squad car, unmarked police
21 car, doing a traffic stop.
22     **Q. Did you see Mr. Santiago?**
23     A. Eventually I did, yes.
24     **Q. When did you see him?**

Page 6

1      A. When we were asked to -- when we were in
2  the process of putting him in the back of the
3  wagon for transport.
4      **Q. When you put him in the back of the**
5  **wagon, was he handcuffed?**
6      A. Yes.
7      **Q. Did you ever view the gun allegedly**
8  **found in this incident?**
9      A. No.
10     **Q. Did you observe any of the other police**
11 **officers at the scene locate a gun?**
12     A. No.
13     **Q. How was Mr. Santiago treated in terms of**
14 **how he was physically handled when placed into**
15 **the wagon?**
16     MS. PRESTON: Objection, form.
17 BY THE WITNESS:
18     A. He just stood there. He was handcuffed,
19 hands behind his back. I opened the door to the
20 back of the wagon and he entered the back of the
21 wagon and sat down.
22     **Q. He didn't resist?**
23     A. No, ma'am.
24     **Q. Did you have any conversations with**

Page 7

1  Mr. Santiago?
2      A. Not that I recall, no.
3      **Q. How about any conversations with any of**
4  **the officers on the scene?**
5      MS. PRESTON: Other than what he has
6  testified to?
7  BY MS. BAUMANN:
8      **Q. Other than what you have testified to.**
9      A. No.
10     **Q. Do you have any personal knowledge of**
11 **the cause for the arrest in this matter?**
12     MS. PRESTON: Objection, vague.
13 BY THE WITNESS:
14     A. No. They asked if we could transport
15 the prisoner to the 13th District. We said yes.
16 BY MS. BAUMANN:
17     **Q. You had no personal knowledge about what**
18 **had transpired before you arrived on the scene?**
19     A. Basically they told us he was a prisoner
20 and I believe they said he was going for a UUW.
21     MS. BAUMANN: Nothing further.
22     MS. PRESTON: We will reserve signature.
                    (Whereupon, the witness was
23                   excused and the deposition
                    concluded at 2:20 p.m.)
24

Page 8

1          CERTIFICATE OF REPORTER
2
3
4      I, Donna J. Smuda, a Certified Shorthand
5  Reporter in the State of Illinois, do hereby
6  certify that the foregoing was reported by
7  stenographic and mechanical means, which matter
8  was held on the date, and at the time and place
9  set out on the title page hereof and that the
10 foregoing constitutes a true and accurate
11 transcript of same.
12     I further certify that I am not related
13 to any of the parties and I have no financial
14 interest in the outcome of this matter.
15     I have hereunder subscribed my hand on
16 the 22nd day of November, 2011.
17
18
19
20
21
22          _____
            Donna J. Smuda
            Notary Public
23          Certified Shorthand Reporter
24

Page 9

3 (Pages 6 to 9)

# EXHIBIT M

**A504BF9**
**OFFICER MAREK DROZD      May 17, 2011**

```
 1    STATE OF ILLINOIS    )
                           )   SS:
 2    COUNTY OF COOK       )

 3        IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
              COUNTY DEPARTMENT - MUNICIPAL DIVISION
 4

 5    JAVIER SANTIAGO,                  )
                                        )
 6                    Plaintiff,        )
                                        )
 7        vs.                           )   No. 10 C 4691
                                        )
 8    CITY OF CHICAGO, a municipal      )
      corporation, et al.,              )
 9                                      )
                      Defendants.
10

11            The discovery deposition of OFFICER MAREK

12    DROZD, taken under oath on the 17th day of May 2011,

13    at Suite 500, 20 South Clark Street, Chicago,

14    Illinois, pursuant to the Rules of the Supreme Court

15    of Illinois and the Code of Civil Procedure, before

16    Devan J. Moore, a certified shorthand reporter, in

17    and for the County of Cook and State of Illinois,

18    pursuant to notice.

19

20

21

22    ATKINSON-BAKER, INC.
      COURT REPORTERS
23    (800)288-3376
      www.depo.com
24    File No.: A504BF9
```

A504BF9
**OFFICER MAREK DROZD**      May 17, 2011

| | |
|---|---|
| 1  APPEARANCES: | 1      (Witness sworn.) |
| 2      BAUMANN & SHULDINER, by | 2      OFFICER MAREK DROZD, |
|        MS. DEIDRE BAUMANN | 3  called as a witness herein, having been first duly |
| 3      20 South Clark Street | 4  sworn, was examined and testified as follows: |
|        Suite 500 | 5      EXAMINATION |
| 4      Chicago, IL 60603 | 6      BY |
|        (312)372-8242 | 7      MS. BAUMANN: |
| 5        for the plaintiff; | 8    **Q   Please state your name for the record.** |
| 6  CITY OF CHICAGO DEPARTMENT OF LAW, by | 9    A   Marek, M-a-r-e-k, Drozd, D-r-o-z-d. |
|        MS. AMY PRESTON | 10   **Q   And where do you work?** |
| 7      30 North LaSalle Street | 11   A   The Chicago Police Department. |
|        Room 1400 | 12   **Q   How long have you been with CPD?** |
| 8      Chicago, IL 60602 | 13   A   I'll have 10 years in July. |
|        (312)742-4045 | 14   **Q   And what is your position?** |
| 9        for the defendants. | 15   A   I am a police officer. |
| 10 | 16   **Q   As a police officer are you a regular beat** |
| 11 | 17  cop or what duties do you have? |
| 12 | 18   A   As a regular I'm assigned to our |
| 13 | 19  counter-terrorist division. |
| 14 | 20   **Q   And how long have you been with** |
| 15 | 21  counter-terrorism? |
| 16 | 22   A   3 years. |
| 17 | 23   **Q   And what do you do with counter-terrorism?** |
| 18 | 24   A   Terrorism-related investigations.  Mainly |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
|                                          Page 2 |                                          Page 4 |

| | |
|---|---|
| 1      I N D E X | 1  organized crime.  That's pretty much it. |
| 2  Witness:                          Page | 2    **Q   In July of 2008 where did you work?** |
|    OFFICER MAREK DROZD | 3    A   I was assigned to the 25th District. |
| 3      Examination by: | 4    **Q   And what did you do at that time?** |
|        Ms. Baumann              4 | 5    A   I was assigned as a beat officer. |
| 4 | 6    **Q   And what does a beat officer do?** |
| 5 | 7    A   Patrol. |
| 6  E X H I B I T S | 8    **Q   How is it that on or about July 27th of** |
|    Number                        Page | 9  2008 did you come into contact with Javier Santiago? |
| 7  None so marked. | 10   A   I was on the way back to the district from |
| 8 | 11  a prisoner transport assignment. |
| 9 | 12   **Q   Where were you transporting the prisoner?** |
|    C E R T I F I E D  Q U E S T I O N S | 13   A   I don't recall at this time. |
| 10 Page                          Line | 14   **Q   And on your way back to the station you** |
|    None. | 15  were called for assistance? |
| 11 | 16   A   No.  That was on-view.  That was an on-view |
| 12 | 17  incident. |
| 13 | 18   **Q   Explain to me what that means, "on-view".** |
| 14 | 19   A   That means that we are driving and we are |
| 15 | 20  observing officers conducting a traffic stop. |
| 16 | 21   **Q   So you weren't specifically called to the** |
| 17 | 22  scene in this instance? |
| 18 | 23   A   No. |
| 19 | 24   **Q   Okay.  When you arrived at the scene what** |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
|                                          Page 3 |                                          Page 5 |

2 (Pages 2 to 5)

**Atkinson-Baker, Inc.**                    **1 (800) 288-3376**

A504BF9

**OFFICER MAREK DROZD      May 17, 2011**

1    did you see?
2       A    We observed an unmarked vehicle and another
3    vehicle, which I cannot describe.
4       **Q    In the unmarked vehicle was a police**
5    **vehicle driven by Moussa and Tooze (phonetic)?**
6       MS. PRESTON: Objection. Speculation.
7          Go ahead.
8    BY MS. BAUMANN:
9       **Q    Do you know?**
10      A    I don't know who was driving. I didn't
11   know these officers at that time.
12      **Q    But it was an unmarked police vehicle that**
13   **you saw?**
14      A    Yes.
15      **Q    And how many police officers did you see?**
16      A    I don't recall at this time.
17      **Q    And the individual being stopped were you**
18   **able to view him?**
19      A    There was a person standing next to a car,
20   but I can describe that person.
21      **Q    Do you recall if that person was**
22   **handcuffed?**
23      A    I believe the person was handcuffed
24   already.

Page 6

1    called him and I asked him if he remembered what this
2    event was about.
3       **Q    And what did he say to you?**
4       A    He says, No, I have to look it up, the
5    name.
6       **Q    Okay. Anything else about the conversation**
7    **that you recall?**
8       A    No. That's about it. Everything else
9    happened in the office of Corporation Counsel.
10      **Q    Okay. And did you have any independent**
11   **recollection of the event?**
12      MS. PRESTON: Objection. Form.
13      THE WITNESS: Can you be more specific?
14   BY MS. BAUMANN:
15      **Q    I guess at some point you were served with**
16   **notice of the lawsuit. When you were served notice,**
17   **did you have any independent recollection of what had**
18   **occurred?**
19      A    No.
20      **Q    When you arrived on the scene, what did you**
21   **do?**
22      A    We asked the officers on the scene if they
23   needed any assistance.
24      **Q    And what did they say?**

Page 8

1       **Q    Do you have any independent knowledge of**
2    **why that person was stopped?**
3       MS. PRESTON: Objection. Form.
4       THE WITNESS: Can I answer?
5       MS. PRESTON: Yes.
6       THE WITNESS: No.
7    BY MS. BAUMANN:
8       **Q    Have you ever had any discussions with any**
9    **officer concerning the stop and the arrest of Javier**
10   **Santiago?**
11      MS. PRESTON: I'm just going to instruct you
12   not to answer about any discussions you've had in my
13   presence or the presence of your other counsel in
14   this case. But otherwise you can answer.
15      THE WITNESS: The only discussion outside the
16   office -- I had a discussion with my partner.
17   BY MS. BAUMANN:
18      **Q    Who is your partner?**
19      A    Officer Surma.
20      **Q    How do you spell that?**
21      A    S-u-r-m-a.
22      **Q    Okay. And what did you an Officer Surma**
23   **discuss?**
24      A    After I got notified of the lawsuit I

Page 7

1       A    They asked us if we could transport one to
2    the 13th District.
3       **Q    And did you do that?**
4       A    Yes.
5       **Q    And was that Mr. Santiago you transported?**
6       A    Based on the report, yes.
7       **Q    Do you recall any conversations you had**
8    **with Mr. Santiago?**
9       A    I don't recall having any conversation at
10   this time.
11      **Q    Do you recall anything either of the**
12   **officers may have said to you at the scene other than**
13   **what you've already said?**
14      A    No.
15      **Q    Did you witness either of the officers on**
16   **the scene push or in any way manhandle Mr. Santiago?**
17      MS. PRESTON: Objection. Form.
18      THE WITNESS: No.
19   BY MS. BAUMANN:
20      **Q    Did you ever view the gun that was**
21   **allegedly taken from Mr. Santiago's car?**
22      MS. PRESTON: Objection. Form.
23      THE WITNESS: No.
24

Page 9

3 (Pages 6 to 9)

# EXHIBIT N

A504BF9
**OFFICER MOUSSA**      **May 17, 2011**

```
 1    STATE OF ILLINOIS     )
                            )    SS:
 2    COUNTY OF COOK        )

 3        IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
              COUNTY DEPARTMENT - MUNICIPAL DIVISION
 4

 5    JAVIER SANTIAGO,                    )
                                          )
 6                        Plaintiff,      )
                                          )
 7        vs.                             )    No. 10 C 4691
                                          )
 8    CITY OF CHICAGO, a municipal        )
      corporation, et al.,                )
 9                                        )
                          Defendants.
10

11            The discovery deposition of OFFICER

12    MOUSSA, taken under oath on the 17th day of May 2011,

13    at Suite 500, 20 South Clark Street, Chicago,

14    Illinois, pursuant to the Rules of the Supreme Court

15    of Illinois and the Code of Civil Procedure, before

16    Devan J. Moore, a certified shorthand reporter, in

17    and for the County of Cook and State of Illinois,

18    pursuant to notice.

19

20

21

22    ATKINSON-BAKER, INC.
      COURT REPORTERS
23    (800)288-3376
      www.depo.com
24    File No.:  A504BF9
```

A504BF9
**OFFICER MOUSSA**     **May 17, 2011**

**Page 2**

```
 1   APPEARANCES:
 2   BAUMANN & SHULDINER, by
     MS. DEIDRE BAUMANN
 3   20 South Clark Street
     Suite 500
 4   Chicago, IL 60603
     (312)372-8242
 5      for the plaintiff;
 6   CITY OF CHICAGO DEPARTMENT OF LAW, by
     MS. AMY PRESTON
 7   30 North LaSalle Street
     Room 1400
 8   Chicago, IL 60602
     (312)742-4045
 9      for the defendants.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

**Page 3**

```
 1              I N D E X
     Witness:                    Page
 2   OFFICER MOUSSA
        Examination by:
 3      Ms. Baumann           4,49
        Ms. Preston           48
 4
 5
            E X H I B I T S
 6   Number                      Page
     None so marked.
 7
 8
 9      C E R T I F I E D  Q U E S T I O N S
     Page                        Line
10   None.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

**Page 4**

```
 1              (Witness sworn.)
 2          OFFICER MOUSSA,
 3   called as a witness herein, having been first duly
 4   sworn, was examined and testified as follows:
 5          EXAMINATION
 6              BY
 7          MS. BAUMANN:
 8      Q   Sir, would you state your name for the
 9   record, please.
10      A   Officer Moussa, M-o-u-s-s-a.  Star 5509,
11   Chicago Police Department.
12      Q   Okay.  How long have you been with the
13   police department?
14      A   8-and-a-half years.
15      Q   And where do you currently work?
16      A   Unit 153.
17      Q   And where is that located?
18      A   Homan Square.
19      Q   Homan Square?
20      A   Yes, ma'am.
21      Q   What police district is that?
22      A   It's a unit.
23      Q   Explain what is a unit.  Explain that.
24      A   First of all, we're called a mobile strike
```

**Page 5**

```
 1   force, and we respond all over the city to any type
 2   of incident that occurs; whether it be a gang
 3   suppression mission, a disturbance, crowd control.
 4   Things of that nature.
 5      Q   And how long have you been with Homan
 6   Square?
 7      A   Homan Square, 6 months.
 8      Q   And where were you prior to that?
 9      A   The 25th District.
10      Q   In what capacity?
11      A   Patrol.
12      Q   And how long were you a patrol?
13      A   A year in 25.
14      Q   And prior to that?
15      A   Mobile Strike Force, Unite 153.
16      Q   And out of Homan Square as well?
17      A   Out of Homan Square, yeah.  The same unit.
18      Q   And how long were you there?
19      A   A year and a half maybe.
20      Q   Doing the same thing that you do now?
21      A   Sure.  Going to different districts
22   citywide.
23      Q   And prior to that?
24      A   The 13th District.
```

2 (Pages 2 to 5)

A504BF9
**OFFICER MOUSSA**     **May 17, 2011**

**Page 6**

1  Q  **In what capacity?**
2  A  I started out in patrol.
3  Q  **How long were you on patrol?**
4  A  I want to say maybe 4 to 6 months. I'm not
5  sure.
6  Q  **And then...?**
7  A  Assigned to the gang unit.
8  Q  **And what does the gang unit do?**
9  A  We investigate gang crimes, complaints
10 about gang members. Keep tabs on gang members in the
11 area. Do follow-ups on crime that involve gang
12 members.
13 Q  **And in July of 2008 you were in the gang**
14 **unit at the 13th District?**
15 A  Yes, ma'am.
16 Q  **Prior to July 2008 were you familiar with**
17 **Javier Santiago?**
18 A  No, ma'am.
19 Q  **You had never met him before?**
20 A  No, ma'am.
21 Q  **Did you hear of him prior to that date?**
22 A  No, ma'am.
23 Q  **What special training, if any, did you**
24 **receive with the gang unit?**

**Page 7**

1  A  Special training? You might go to special
2  classes, interrogation classes maybe -- interrogation
3  technique classes. I know I went to one when I was
4  in the gang unit there. Search warrant classes.
5  Maybe special classes when you're doing search
6  warrants to enter a house safely and with a team and
7  things of that nature. Maybe a couple firearm
8  courses.
9  Q  **So safety, firearm?**
10 A  Yeah. I think it's called TTU, tactical
11 barricade and entrance team or something like that
12 (sic). I'm not sure.
13 Q  **And what is your highest level of**
14 **education?**
15 A  I've completed -- I left my senior year of
16 college.
17 Q  **And why did you leave?**
18 A  My father became ill at a restaurant. So I
19 took over that restaurant for my dad.
20 Q  **Sorry to hear that.**
21    **What were you studying?**
22 A  Kinesiology. Sports medicine.
23 Q  **And how long did you work at your father's**
24 **restaurant?**

**Page 8**

1  A  My whole life, but after that 3 years
2  maybe.
3  Q  **What's the restaurant?**
4  A  It's an Armenian restaurant in Los Angeles.
5  Q  **I'm looking for good restaurant.**
6  A  This one is good, but it's in LA.
7  Q  **Turning your attention to July 27th of**
8  **2008, what is the first thing that you remember**
9  **concerning your contact with Mr. Santiago?**
10    MS. PRESTON: Objection to form.
11    Go ahead.
12    THE WITNESS: We received a call from our
13 sergeant.
14 BY MS. BAUMANN:
15 Q  **Who is the sergeant?**
16 A  Ronan (phonetic).
17 Q  **And what did Ronan say?**
18 A  Ronan was talking to Officer Tooze
19 (phonetic) who I was working with that day. Stating
20 that there was an individual after, Officer Tooze
21 related it to me, on the corner of Rice and Damen
22 that was in possession of a handgun.
23 Q  **Do you know what time you received this**
24 **call?**

**Page 9**

1  MS. PRESTON: Objection. Misstates testimony.
2  BY MS. BAUMANN:
3  Q  **You and your partner received this call?**
4  A  Yes, ma'am.
5  Q  **What time?**
6  A  I don't recall the time.
7  Q  **Did you talk to Sergeant Ronan yourself at**
8  **any point?**
9  A  No, I don't believe so.
10 Q  **When I say "at any point," at this point**
11 **that we're talking about first of all?**
12 A  No. At the point where he told us to
13 relocate to where he was, no, I did not talk to him.
14 Q  **Okay. So any information you have**
15 **concerning the conversation between Tooze and Ronan**
16 **came from Tooze?**
17 A  Yes, ma'am.
18 Q  **And what was your understanding of what**
19 **this person -- individual was doing at the corner of**
20 **Reiss and Damen?**
21 A  My understanding was the person at Reiss
22 and Damen was in possession of a handgun that he had
23 inside his vehicle. Sergeant was going to set up
24 surveillance. And we were going to stay back and

3 (Pages 6 to 9)

A504BF9
**OFFICER MOUSSA      May 17, 2011**

| | |
|---|---|

1  until Sergeant Ronan needed us to either take this
2  person down or whatever the case.
3  **Q   Did you have a description of the person?**
4  A   Yes.
5  **Q   And what was the description?**
6  A   A male Hispanic, long black hair black,
7  black tank top, black shorts, black gym shoes.
8  **Q   And was the person supposed to be standing**
9  **on the corner of Rice and Damen or in a car?  What**
10  **was your under standing?**
11  A   That the person was in the area of Rice and
12  Damen, that he had a vehicle which had a handgun in
13  it.
14  **Q   Do you know who provided the information to**
15  **Ronan concerning this alleged handgun?**
16  A   I believe --
17  MS. PRESTON:  Wait.  Just give me a second to
18  object.
19  THE WITNESS:  Okay.
20  MS. PRESTON:  I'm just going to object on the
21  basis of the informant's privilege and instruct you
22  not to answer to the extent that you would be
23  providing any identifying information of the
24  informant.

Page 10

1  Competence.
2  Go ahead.
3  THE WITNESS:  Well, an informant is one thing.
4  A confidential informant is something totally
5  different.  This wasn't a confidential informant.
6  This was a citizens that came into the desk at the
7  13th District.
8  Working in the gang unit, some gang
9  officers do have confidential informants or CIs that
10  they use that are registered.  And I was not one of
11  those members that had a confidential informant.
12  But any type of citizen that lodged a
13  complaint or that wanted to report something, we took
14  that information and we followed up on it.  Sometimes
15  it panned out.  Sometimes it didn't.  But at least --
16  a lot of people seemed to be afraid to identify
17  themselves living in that community or whatever the
18  case is.
19  BY MS. BAUMANN:
20  **Q   Is there any way that you as police**
21  **officers attempt to ensure the reliability of the**
22  **informant, of a citizen informant?**
23  MS. PRESTON:  Objection.  Form.
24  Go ahead.

Page 12

1  But go ahead.  You can answer if you
2  know, but yes or no.
3  THE WITNESS:  Yes.
4  MS. BAUMANN:  I forgot the question.  Would you
5  read it back, please.
6  (Whereupon, the record was read
7  as requested.)
8  BY MS. BAUMANN:
9  **Q   And how is it that you knew who provided**
10  **the information?**
11  A   I believe Sergeant Ronan told Officer Tooze
12  on the phone that the desk sergeant in the 13th
13  District provided this information.
14  **Q   Were you made aware of the identity of the**
15  **informant?**
16  A   No.
17  **Q   So at the time you were made aware that**
18  **there was an alleged informant, did you have any**
19  **information on this informant whatsoever?**
20  A   No, ma'am.
21  **Q   What is the policy and/or practice for the**
22  **Chicago police with regards to using unidentified**
23  **informants in pursuing an investigation?**
24  MS. PRESTON:  Objection.  Form.  Foundation.

Page 11

1  THE WITNESS:  I mean, sometimes you could tell
2  by what they're telling you if it's true, if there's
3  something true to what they're saying.  And sometimes
4  you know that maybe this person just wants people off
5  their block because she's tired of seeing kids
6  running up and down the street or whatever the case
7  is.
8  You take it to each its own, and you
9  just look into it.  But for a citizen to come into a
10  station and you not listen to their concerns, I think
11  that you're totally missing the purpose of being a
12  police officer.
13  Do you know what I mean?
14  BY MS. BAUMANN:
15  **Q   Yeah.  I mean, the concern is obviously**
16  **what happens or what can happen, such as what**
17  **happened in this case.**
18  **Your partner spoke with Sergeant**
19  **Ronan?**
20  A   On his cell phone.
21  **Q   On the cell phone.**
22  **And what did Officer Tooze say to you?**
23  A   He gave me a description of the information
24  that he received from Ronan, and that we were going

Page 13

4 (Pages 10 to 13)

A504BF9
**OFFICER MOUSSA    May 17, 2011**

Page 14

1  over to Chicago -- in the area of Chicago and Damen.
2  And we actually parked on Chicago and Hoyne. And at
3  that point there was no more telephone communication.
4         We went to a radio communication, but
5  within our -- only using our radius. Almost like a
6  private channel.
7     **Q  Okay. And with that private channel you**
8  **were able to communicate with Sergeant Ronan?**
9     A  Yes, ma'am.
10    **Q  And did you in fact communicate with him?**
11    A  Yes.
12    **Q  And what was said between you?**
13    MS. PRESTON: Over the radio?
14    MS. BAUMANN: Over the radio.
15    THE WITNESS: Over the radio?
16          Sergeant Ronan was in position. He
17  was watching the subject under surveillance. Gave us
18  the information for the vehicle, for the license
19  plate. And gave us this information to the subject
20  himself.
21          At that point I was punching in
22  information into our computer system. So the first
23  thing I did was run a LEADS on the vehicle. That
24  check came back for Mr. Santiago.

Page 15

1     **Q  Okay. Let's back up a little bit.**
2           **You were positioned on -- you were**
3  **parked on Chicago at Hoyne. Do you know where Ronan**
4  **was parked?**
5     MS. PRESTON: Objection. Speculation.
6  Mischaracterizes his testimony.
7          Go ahead.
8     THE WITNESS: He was in the area of Damen and
9  Rice. And do I know his actual surveillance point?
10 No, I don't.
11 BY MS. BAUMANN:
12    **Q  And Sergeant Ronan was talking to both you**
13 **and your partner over the radio providing you with**
14 **information. What information was he giving you?**
15    A  He gave us the information to the vehicle,
16 information on the subject, and to stand by. He
17 didn't give anything further.
18    **Q  Information as to the vehicle, is that the**
19 **make, model, color?**
20    A  Make, model, color, license plate, which
21 was also given at the 13th District desk.
22    **Q  And when you said you punched in the**
23 **information into the LEADS system, would you punch in**
24 **the license plate number?**

Page 16

1     A  That's right.
2     **Q  And what did you discover, if anything,**
3  **when you punched in the license plate number?**
4     A  The vehicle was registered to a
5  Mr. Santiago.
6     **Q  Anything else?**
7     A  No.
8     **Q  And what did you --**
9     A  Well, there was something else. After that
10 vehicle came back to Mr. Santiago then we starting
11 getting a LEADS response to a caution file alert,
12 gang member, subject on parole. And that was
13 Mr. Santiago coming back to the name -- hitting off
14 the name after running the vehicle.
15    **Q  Can you repeat that again. "Caution"...?**
16    A  Caution file. So it says, Caution file.
17 Be aware of gang member. Spanish Cobra. Subject is
18 armed and dangerous. Subject is on parole for armed
19 robbery.
20          And the pages start getting sent
21 through that way? And it's not like -- an officer
22 safety alert. That's what it is. That's what it's
23 letting us know.
24    **Q  At that time did it indicate whether or not**

Page 17

1  Mr. Santiago had a valid driver's license?
2     A  He did not have it. Never issued a
3  license.
4     **Q  Does that come up on the LEADS?**
5     A  They all come back no valid DL, never
6  issued; or no valid DL, revoked; no valid DL,
7  suspended.
8     **Q  Okay. Do you recall which it was in this**
9  **case?**
10    A  No DL. Never issued.
11    **Q  Never issued.**
12          **Okay. On the LEADS does it provide**
13 **any information on insurance?**
14    A  No. The only time it would provide
15 insurance if you got a ticket and you went to court
16 and you're supposed to provide insurance and you
17 didn't.
18          Let's say a judge tells you to go get
19 an SR22 or get insurance and you don't, then you get
20 a mandatory insurance violation. Your license is
21 suspended. That's when that will come up. It will
22 come up, License suspended. And then underneath it
23 will say, Mandatory insurance violation; letting us
24 know that you already got stopped without insurance

5 (Pages 14 to 17)

**Atkinson-Baker, Inc.**                    **1 (800) 288-3376**

A504BF9
OFFICER MOUSSA     May 17, 2011

**Page 18**

1  and you're still operating the vehicle uninsured.
2       And the way to get that off is just
3  going in and, Here's my insurance.
4       Q   Okay.  What happened next?  After you're
5  now receiving information in the LEADS, did you have
6  further discussion with Sergeant Ronan?
7       A   Sergeant Ronan stated over the radio that
8  he did see the subject fitting the description of
9  Javier Santiago.  We pulled up a picture of
10  Mr. Santiago on our CLEAR system that's in the
11  vehicle, relating our description to Sergeant Ronan,
12  which was, Yes, this is the guy.  He fits the
13  description.
14       And at that time Sergeant Ronan told
15  us to stand by, that he was walking out on Damen at
16  Rice back and forth.  And we were still running stuff
17  into our computer just to make sure who this person
18  was.
19       Q   Who was walking on Damen back and forth?
20  Ronan or Santiago?
21       A   No.  Santiago.
22       Q   Do you know if Santiago had any gun visible
23  on him as he was walking back and forth on Damen?
24       MS. PRESTON:  Objection.  Speculation.

**Page 19**

1       THE WITNESS:  No, ma'am.
2  BY MS. BAUMANN:
3       Q   What happened next?
4       A   At that point Officer Ronan said that the
5  subject entered the vehicle which was parked on Damen
6  northbound at Rice.  Subject opened a pack of
7  cigarettes.  Threw those wrappers out the window and
8  was attempting to make his way into traffic
9  northbound on Damen.
10       Q   Did you see any of this, or did Sergeant
11  Ronan tell you?
12       A   Sergeant Ronan.
13       Q   And what happened next?
14       A   At that point we went northbound on Hoyne
15  to Walton.  Eastbound on Walton to Damen.  And curbed
16  Mr. Santiago's vehicle at 925 North Damen.
17       Q   What was the purpose of your curbing his
18  vehicle at that location?
19       A   The first purpose was throwing a wrapper
20  out of the window and knowing him not to have a
21  driver's license.
22       Q   So prior to pulling him over you knew he
23  didn't have a driver's license?
24       A   Yes, ma'am.

**Page 20**

1       Q   Now, as a member of this unit would you
2  ordinarily pull over citizens for throwing litter out
3  of a window?
4       MS. PRESTON:  Objection.  Form.  Foundation.
5       Go ahead.
6       THE WITNESS:  Yeah, you do it.  Yeah, you stop
7  people all time if they throw litter, not wearing
8  their seat belt.  Absolutely.  Traffic is a big part
9  of our police work that we do every day.
10  BY MS. BAUMANN:
11       Q   As part of the gang unit?
12       A   Yeah.  A gang unit is just a gang unit, but
13  you still have your responsibilities as a police
14  officer.  So just being in the gang unit that doesn't
15  mean that if you ran a red light in front of me, I'm
16  not going to pull you over and stop your vehicle for
17  disobeying that red light.
18       Do you know what I mean?
19       Q   Yeah.  Well, let me ask you this:
20       You were driving an unmarked car;
21  correct?
22       A   Yes, ma'am.
23       Q   Do you have a book of tickets on which you
24  can write people tickets for traffic violations and

**Page 21**

1  things like that in your car?
2       A   I have a ticket book.  I have an ANOV book.
3       Q   A what?
4       A   ANOV.
5       Q   What is that?
6       A   A City ordinance violation book.  And I
7  have a parking book that I bring with me.
8       MS. PRESTON:  Just for the record, ANOV is
9  A-N-O-V, all caps.
10  BY MS. BAUMANN:
11       Q   So in your experience it's common to write
12  traffic or ordinance violation tickets as a member of
13  Unit 153, is it?
14       A   153?  Absolutely.
15       Q   Yeah?
16       A   Yeah.  It's all part of community policing.
17  You know, take care of the little things.  The big
18  things take care of themselves.  But you have all
19  those books with you.  And it's a big part of police
20  work.
21       And if you want an example, I'll give
22  you one.
23       Q   Go ahead.
24       A   If you have a handicapped spot and you're

Atkinson-Baker, Inc.                    1 (800) 288-3376

A504BF9

OFFICER MOUSSA      May 17, 2011

1   their tickets.
2          They take their tickets.  You go to
3   the front of the sergeant.  Give the sergeant the
4   tickets.  The sergeant issues an I-bond.  At which
5   time once he's issued the I-bond, goes over his court
6   dates.  "This is your I-bond.  This is when you have
7   to return."  Cuffs are released.  "Have a nice day.
8   Don't drive your car".
9          The car is automatically inventoried,
10  impounded, and totaled for those violations:  no
11  insurance, no driver's license.
12         If the individual asks, "Can I get
13  some belongings out of my car?"  "Absolutely.  Let's
14  go to the car."  Go in it.  "What do you want?"  Open
15  the trunk, and I find an RPG back there, he's going
16  to go to jail for the RPG.
17  **Q   What is an RPG?**
18  A   A rocket propelled grenade.
19         Do you know what I mean?
20         (Laughter.)
21  THE WITNESS:  I'm sorry.
22  BY MS. BAUMANN:
23  **Q   No, that's okay.**
24  A   But anyway, if you don't get their stuff

Page 26

1   A   Yes.
2   **Q   Do you go into the glove compartment?**
3   A   Yes, ma'am.
4   MS. PRESTON:  I'm just going to object to
5   foundation.
6          Are we still just talking about if
7   it's an impound search?
8   MS. BAUMANN:  Yes.
9   MS. PRESTON:  Okay.
10  THE WITNESS:  And we go into those areas
11  because I don't want you to say after I towed your
12  car that I had $10,000 cash in the glove compartment.
13  The car gets towed.  Then they pick up the vehicle,
14  and now there's no $10,000 in there.
15         So I'm going to make sure that there's
16  not anything weird.  And I'm going also going to look
17  for contraband at that point.  Any firearms,
18  narcotics, paraphernalia, anything that you shouldn't
19  have in that vehicle.
20  BY MS. BAUMANN:
21  **Q   Do you believe it's lawful for the police**
22  **to search for contraband pursuant to an impoundment**
23  **as you've described?**
24  MS. PRESTON:  Objection.  Form.  Foundation.

Page 28

1   out, the car is impounded and towed, they've got to
2   report to the impound yard with a valid driver's
3   license and insurance to get their vehicle out.
4   **Q   Do you know what the policies and**
5   **procedures are for inventorying an automobile?**
6   A   Yes.
7   **Q   What are they?**
8   MS. PRESTON:  Objection.  Foundation.
9   Competence.
10  Go ahead.
11  THE WITNESS:  Inventory for violations of ILCS
12  for a driver's license and insurance.  Go through the
13  vehicle.  Secure that vehicle.
14         But say I see that Mr. Santiago has a
15  Norman Rockwell painting in the back seat of that
16  car, I'm going to ask him, What do you want me to do
17  with this painting?  Do you want the Chicago Police
18  Department to inventory this and when you get out you
19  come back to jail and pick it up; or would you like
20  me to put it in the trunk of the vehicle and secure
21  it back there.
22  BY MS. BAUMANN:
23  **Q   When you say go through the vehicle, do you**
24  **go in the trunk?**

Page 27

1          Go ahead.  Incomplete hypothetical.
2   THE WITNESS:  Are we just talking about -- are
3   we talking about Mr. Santiago's case?
4   BY MS. BAUMANN:
5   **Q   The situation you posed with the license**
6   **and insurance.**
7   A   The license insurance, I'm definitely going
8   to look for a weapon when I pull you out of that car
9   on your person.  For officer safety, I'm going to do
10  a protective patdown.  Done.
11         I'm also going to do a protective
12  patdown of that vehicle that you have control over.
13  So is that front seat?  Yes.  Is that the glove
14  compartment?  Yes.  Is that engine department?
15  Absolutely not.  Because you're not going to be able
16  to get to that engine department if I have you where
17  you're at out of the driver's seat.  But that's where
18  I might immediately look.
19         Am I going to look behind the seat?
20  Absolutely.  If your back seat folds down, am I going
21  to look into the trunk?  Absolutely.  Could you have
22  had time before I pulled you over to reach back and
23  pull down that back seat and throw anything into the
24  trunk?  Yeah, you do.  You do have that capability of

Page 29

8 (Pages 26 to 29)

**Atkinson-Baker, Inc.**                    **1 (800) 288-3376**

A504BF9

**OFFICER MOUSSA      May 17, 2011**

Page 30

1  doing that.
2        Do you know what I mean?
3     **Q   Yeah, but if --**
4     A   We're still talking about license and
5  insurance?
6     MS. PRESTON:  Wait.  Wait.  There's no question
7  pending.
8     THE WITNESS:  What's the question?
9  BY MS. BAUMANN:
10     **Q   I just want to talk about this license and**
11  **insurance issue.**
12     A   Right.
13     **Q   You're saying that it is appropriate to**
14  **look for contraband behind the seats and all of that?**
15     A   No.  What I'm saying is that once we search
16  that vehicle, you're searching that vehicle; but
17  you're searching that vehicle for things that I told
18  you we were going to search it for.
19        We're searching for jewelry.  Maybe
20  you have a Rolex watch behind the seat.  If I find
21  that watch, am I going to inventory it?  A hundred
22  percent.  Absolutely.  Because if that watch goes
23  missing by the time I have you in custody to you go
24  get your car, who is responsible for that watch?  I

Page 31

1  was.  You weren't.  You're handcuffed.
2     MS. PRESTON:  You're talking about an impound
3  situation?
4     THE WITNESS:  Yes.  Sure.  That's all we're
5  talking about.
6     MS. BAUMANN:  Right.  I wanted to get that
7  straight first of all.
8  BY MS. BAUMANN:
9     **Q   In this case, in Santiago's case, was the**
10  **car searched pursuant to the an impoundment**
11  **situation?**
12     A   Yes, it was.  The vehicle was going to be
13  impounded.  But we also had information that this
14  individual had a handgun in that vehicle.
15     **Q   Was there a search conducted of the**
16  **vehicle?**
17     A   Yes.
18     **Q   And when was that?**
19     A   On the scene.  As soon as we placed him
20  into custody for littering, no license, and no
21  insurance.
22     **Q   Who searched the car?**
23     A   Officer Tooze.
24     **Q   As you had Santiago outside of the car, I**

Page 32

1  take it you did not see a gun on his person?
2     A   No.  Officer Tooze and I patted down
3  Mr. Santiago.  No firearm on his person.
4     **Q   Did you have an opportunity to view the**
5  **car --**
6     A   Yes.
7     **Q   -- the interior of the car?**
8     A   Yes.
9     **Q   Was there a gun in plain view?**
10     A   No.
11     **Q   Okay.  Mr. Santiago is outside of the car.**
12  **Do you recall at what point you cuffed him if you**
13  **did?**
14     A   Officer Tooze cuffed him.  And as I saw
15  Officer Tooze cuffing him and he was secured -- was
16  not resisting -- I walked up.  Assisted with the
17  cuffing.  And that's when the wagon pulled up, 25.  I
18  forgot their beat, but I know it was a wagon.
19        And we had asked them if they could
20  transport this individual back to is 13 for us.
21     **Q   Did you say anything to Santiago during**
22  **this time --**
23     A   No.
24     **Q   -- between the time you cuffed him until**

Page 33

1  the time the wagon -- or the officers took him?
2     A   No.
3     **Q   Did you see Officer Tooze search the car?**
4     A   Yes.
5     **Q   And how did Officer Tooze search the car?**
6     A   Officer Tooze was on the driver's side, and
7  I was on the passenger side of vehicle.  Officer
8  Tooze looked under the seat of the driver's side.
9  Looked all around the driver's compartment, at which
10  time he went to the back of the seat.  Looked in the
11  back seat.  Looked under the seat in the back.
12  Looked in the front seat from the back.
13        Then Officer Tooze went into the
14  center console.  Looked in the center console, at
15  which time the center console -- as Officer Tooze
16  pulled up the lever to the center console, this
17  center console didn't open.  But the center console
18  came up off the ground or something to that effect.
19        I'm not a hundred percent sure.  And
20  that's when Officer Tooze lifted the back bottom of
21  the center console.  It wasn't held down by any board
22  bolts.  Officer Tooze removed the handgun from
23  underneath the center console and the carpet.
24        That's the best I can recall.

9 (Pages 30 to 33)